[1] This suit was originally begun in the Magistrate Court of the City of St. Louis by respondent, as plaintiff, to recover from appellant, as defendant, the sum of $562.19 for damage to defendant's viaduct bridge near the city of Alton, Illinois. There was a judgment for plaintiff in the Magistrate Court for the amount sued for. On appeal to the Circuit Court of the City of St. Louis, the case was tried before the court without a jury, resulting in a judgment in favor of plaintiff for the same amount, namely, $562.19. Defendant duly appealed.
[2] The evidence shows that on December 26, 1946, a truck belonging to defendant carrying a large crane attempted to pass under defendant's bridge near the city of Alton, Illinois, when the crane struck against the side of the bridge, damaging the pedestrian walkway and some of the *Page 102 
girders supporting the bridge. The facts concerning the occurrence not only are not disputed, but, on the contrary, defendant admitted in the trial court that there was no issue as to liability and that the only question before the court was the amount of damages which plaintiff was entitled to recover.
[3] Defendant contends that the correct measure of damages to real property is the difference between the market value of the property immediately before and immediately after the damage was sustained. The sole point of defendant in this court is that the trial court erred in rendering judgment for plaintiff because there was no evidence before the court as to the reasonable value of plaintiff's property immediately before the casualty and the reasonable value thereof immediately thereafter. Defendant offered no evidence at the trial, relying solely on its contention that there was no proper evidence before the court upon which a judgment for plaintiff could be rendered.
[4] Plaintiff's case consisted of the testimony of three witnesses and the introduction of its Exhibit No. 1, which was an itemized list of charges for labor, material costs, bookkeeping charges for "Movement of Work Equipment" and "Rental of Work Equipment" and including such items as charges for "Railroad Retirement" and "Vacations." Also included in the itemized list were charges for supervision and use of tools, railroad insurance, storeroom expense and handling charges.
[5] William H. Brown, called as a witness for plaintiff, testified that he was a carpenter in the employ of plaintiff. He described the nature of the damage done to the bridge and stated that he found two stiffener angles and two floor support angles were bent or broken and that some of the planking in the walkway of the bridge was broken. He testified at length as to the nature of the work required to repair the damage described. He testified, over the objection of defendant, as to what he did to move a train of cars from Bloomington, Illinois, to Godfrey, Illinois, along with a "work gang" to do repair work on the bridge. He identified plaintiff's Exhibit No. 1, the itemized statement heretofore mentioned, and said that the wages of the cook, lead men, regular men, carpenters, steel men, bridge men, mason gang and laborers were in accordance with the rates per hour set out in plaintiff's Exhibit No. 1; that the hours shown in said exhibit were actually spent by the men on the job; that the items of material set forth in said exhibit went into the repair of the bridge and that all of the materials described therein were necessary to make the repairs; that the work gang and equipment were moved 125.5 miles from Bloomington, Illinois, where they were being used to repair a bridge, to Godfrey, Illinois, because the job at Godfrey was an emergency job; that all of the cars listed in plaintiff's exhibit 1, namely, two flat cars, two coaches, three box cars and a water car, were used in said work unit; that the work unit was brought from Bloomington, Illinois, to Godfrey, Illinois, by a regular train.
[6] L. F. Rapier testified as a witness for plaintiff that he was employed by plaintiff as a bridge and building supervisor. Over defendant's objections, he explained the items of costs and expenses set forth in plaintiff's exhibit 1. He stated that he was familiar with the cost of materials which go into bridge repair work; that he makes up "quite a lot of estimates. Every month most of the prices of steel changes by the hundred weight a few cents. These prices here look all right to me." He testified that the prices listed for the materials were the correct and reasonable prices as of December, 1946 for the materials named; that the "Plus 15%" set forth in plaintiff's exhibit 1 following the itemization of materials was for storeroom expense and the handling of material; that the charge of 6 ¢ per mile made for the movement of work equipment was in accordance with the rate in effect in December 1946. The witness further testified that the rate charged as set forth in plaintiff's exhibit 1 for the "Rental of Work Equipment" and "Movement of Work Equipment" was based upon schedules which "the American Railroad Association has put out." The witness *Page 103 
further stated that the repair on the bridge in question was considered an emergency operation and that it was advisable to repair the bridge in the shortest possible time.
[7] Frank O. Marshall testified on behalf of plaintiff that he was employed as an assistant auditor by plaintiff. Over defendant's objection, he testified that there is a "General Manager's Association" which makes up rules to govern the accounting practices of railroads; that the association prepares the formula for making charges between one carrier and another, which formula is followed in sending bills to individuals. The witness explained at length how these "accounting practices" provide for charges for supervision and for the use of tools, for vacation pay, railroad retirement, unemployment insurance, the storing and handling of tools and the movement and rental of work equipment. The witness referred to the various items of plaintiff's exhibit No. 1 and explained that the figures shown therein represented charges in accordance with the rules set up by the General Manager's Association; that said rules are subscribed to by all the railroads in the middle west and are adhered to in their billing against railroads and individuals and other companies.
[8] The witness testified that in the operation of a railroad it is necessary many times for one railroad to perform work on another railroad's property; that there are signals and protective apparatus that must be worked on by one of the two companies, but not by both of them; that one company will bring the equipment that is necessary to do the work and that these rates have been established to compensate the railroad that furnishes the equipment for the cost of the labor, depreciation, the oil and the value of the cars that are used; that these rates established by the General Manager's Association "are generally accepted by railroads and individuals because they are standard; they have been studied, and they represent cost." The witness further testified that each railroad carries on its books the current value of its properties including bridges owned by it and that each bridge has a separate value on the books somewhere. The grand total of all the costs set forth in the itemized statement — plaintiff's exhibit 1 — was $562.19.
[9] A careful review of the evidence in the record leads inescapably to the conclusion that plaintiff failed to produce before the court evidence of such probative value with respect to its damages as to warrant the court in rendering judgment in its favor. It is true plaintiff did produce evidence to show what it claimed were the costs of repair to the bridge, but we believe it is clear that there were many items in plaintiff's exhibit 1 which were entirely foreign to the proper measure of damages allowable under the decisions of our courts. The practice among the railroads of charging against each other many of the items listed as costs of repair is merely a matter of private agreement between the railroads themselves for their own convenience. No doubt such arrangements and agreements make for efficiency among the railroads themselves and between the railroads and others who may wish to acquiesce therein. Nevertheless, even though such arrangements may be binding upon the railroads agreeing to that methods of measure of damages, they are in no wise binding upon parties who have not agreed thereto nor are the courts in any degree bound to enforce them against persons or corporations who are not parties thereto.
[10] Our courts have established the rule, and have followed it for many years, that the measure of damages to real property is the difference between the market value of the property immediately before and immediately after the damage is sustained. Schaefer et al. v. Frazier-Davis Construction Co., Mo.App., 125 S.W.2d 897; St. Louis Trust Co. v. Bambrick, 149 Mo. 560, 51 S.W. 706; Ingram v. Great Lakes Pipe Line Co., Mo.App., 153 S.W.2d 547; Butcher v. St. Louis-San Francisco R. Co., 225 Mo.App. 749,39 S.W.2d 1066.
[11] In the Schaefer case, supra, the court said: "In an action for damages to a dwelling caused by blasting, the plaintiffs are entitled to recover such sum as will fairly *Page 104 
compensate them for the injuries sustained, and such sum is the difference betweenthe reasonable market value of the dwelling immediately beforethe injury and the reasonable market value immediatelythereafter. Iven v. Winston Bros. Co., Mo. App., 48 S.W.2d 125; McGrath v. Heman Const. Co., 183 Mo.App. 522, 167 S.W. 1086; Faust v. Pope, 132 Mo.App. 287, 111 S.W. 878; Rosen v. Kroger Grocery Baking Co., Mo.App., 5 S.W.2d 649, 652." Schaefer et al. v. Frazier-Davis Const. Co., Mo.App., 125 S.W.2d 897, 898. (Emphasis ours.)
[12] In the above Schaefer case plaintiffs presented evidence as to their damages upon the same theory as did plaintiff in the case at bar, namely, that the sum total of the costs of repair of the damages to plaintiffs' property caused by the blasting of the property by defendant was the measure of the damages which plaintiffs were entitled to recover. There was a verdict for plaintiffs for $5,000.00 in the case, but in reversing the judgment and remanding the cause, the court held that although the verdict was clearly excessive, nevertheless there was no basis in the evidence afforded for adjusting the verdict for a remittitur because there was a total absence of evidence showing the reasonable market value of the property immediately before and its reasonable market value immediately after the accident.
[13] In the case at bar plaintiff earnestly insists, however, that the proper measure of damages to be applied where there is but a temporary injury to structures and where the damage may be repaired or replaced within a comparatively brief period is the sum which would, properly expended, restore the premises to their former condition and the rental of the property until it is repaired or replaced. Plaintiff cites in support of this contention a number of cases involving various states of fact, but we do not believe such cases are applicable to the case at bar because none of them shows a state of facts such as we have in this case. It will be recalled that plaintiff's witness, Frank O. Marshall, testified in the case at bar that each bridge belonging to the company had a separate value on the books of the company. Hence this is not a case where it would be exceedingly tedious, difficult, or impossible for plaintiff to show the value of the bridge immediately before and after the damage was done. Plaintiff had on its books evidence of the value of the bridge and could easily have called a witness or witnesses to testify on that matter and thus have afforded defendant an opportunity to cross-examine thereon and to combat such evidence by other evidence if it could.
[14] If it be argued that evidence of the difference in market value of the bridge before and after the accident would not represent the true measure of damage suffered by plaintiff, because of the emergency nature of the necessary repairs, and that plaintiff should in justice be permitted to show what the costs of repair were, the answer is that courts in rendering decisions must keep in mind justice to all parties.
[15] We realize, of course, that proof of "market" value of land is not the same thing as proof of "market" value of a railroad bridge. We also appreciate the fact that there might be no "market" for the sale of a railroad bridge in the same sense of a "market" for the sale of land. However, if there be a showing that there is no "market" value of the bridge, then the difference in value to plaintiff of the bridge before and after the accident with the "market" element omitted would be a proper showing of damages and more in accord with settled principles of the measure of damages than an ex parte list of costs of repairs such as that presented by plaintiff herein.
[16] The general rule, as heretofore stated, is that the measure of damage is the difference between the reasonable value of the property before and the reasonable value thereof after the accident. We are aware that in cases where the amount of damage is insignificant, as compared to the value of the property as a whole and involves only a small part thereof, there is an exception to the above general rule. However, before allowing plaintiff to rely solely on evidence of the costs of repair, there should be a showing of the comparative *Page 105 
insignificance of the damage to bring the case within such exception to the general rule. After such a showing is made the actual costs of repair might then be shown as a basis for determining the value to plaintiff of the property before and after the accident. In the case at bar plaintiff has not produced any evidence to show such exceptional situation and we have no right to indulge in guess work about it.
[17] If an exception to the market value theory of the measure of damages were to be allowed in this kind of case because of the absence of a "market" value of a bridge, the exception should most certainly go no farther than to permit plaintiff to show what the actual reasonable costs of repair would be on the open market if made by competent persons engaged in such business.
[18] If plaintiff claims there are no persons engaged independently in the business of railroad bridge repairing, then a showing to that effect should be made as a prerequisite to the introduction of evidence of what it cost plaintiff itself to make the repairs of the damage directly arising from defendant's negligence.
[19] We cannot affirm the judgment herein because we believe that the evidence showing the charges for "vacations," the charges for "retirement funds," and "unemployment insurance," the charges for the "storing of materials," all ex parte and unilateral charges insofar as defendant is concerned, are not proper elements to show the actual damage suffered by plaintiff as the direct result of defendant's negligence in the absence of such showings as we have mentioned above. Under the basic principles governing damages defendant is not liable for damages which are merely remotely connected with its negligence, but is liable only for damages directly and proximately caused by its negligence. If defendants in actions brought by railroads in cases such as the one at bar were to be required to pay damages on the basis of private agreements made by and between the railroads with respect to the costs of repair, it would be equivalent to an abdication by the courts of their authority as well as a failure to perform their duty to determine such matters and would constitute a recognition of the railroads as agencies outside and beyond the law. We think it is clear that the measure of damage sought to be imposed by plaintiff in this case would deprive the defendant of its right to inquire into the damages in accordance with the established rules governing the measure of damages.
[20] We are unable to see upon what reasonable and just basis defendant can be charged with the cost to plaintiff of storing materials which the plaintiff had on hand. It was necessary for plaintiff as an active going railroad to have such materials on hand for emergency purposes, but that is not an element of damage to be charged against defendant. It is simply a necessary general cost in the operation of a going railroad, unless, after making a showing of an exceptional situation as heretofore mentioned, plaintiff also makes such storage costs competent and relevant as an element of damage by showing that by having such materials on hand in quantity it reduced the cost thereof and thereby minimized the damages chargeable to defendant. As to charges for vacations and unemployment insurance, it is obvious that the employees of plaintiff would or would not have their vacations and their unemployment insurance granted to them without any regard to whether or not this particular accident ever happened. Even if the "cost of repair" theory were to be held allowable, the items of charges for the rental of work equipment should not be included because there was no evidence that plaintiff was deprived of an opportunity to rent out said equipment by reason of its use in connection with the casualty involved herein. A consideration of all of the matters which we have mentioned above shows that it would not be just nor in accordance with established legal principles to permit a recovery of damages based upon the costs of repair shown by plaintiff in this case, without such further showing as we have referred to. *Page 106 
[21] Inasmuch as defendant admits its liability to plaintiff for such damages as were directly caused by defendant's negligence, the judgment is reversed and the cause remanded.
[22] ANDERSON, P. J., and HUGHES, J., concur.