Lloyd I. BELVEAL and Phyllis M. Belveal, Respondents,

v.

H. B. C. DEVELOPMENT COMPANY, a corporation, Appellant.

No. 22135.

Kansas City Court of Appeals.

Missouri.

May 6, 1955.

James H. Ottman, Sebree, Shook, Hardy & Ottman, Kansas City, Alan F. Wherritt, Wherritt & Turpin, Liberty, for appellant.

Barnett & Skeer, Kansas City, for respondents.

BOUR, Commissioner.

Lloyd I. Belveal and Phyllis M. Belveal, husband and wife, brought this action against H. B. C. Development Company, a corporation, to recover damages for injury to certain property, alleged to have been caused by the destruction of a natural watercourse by defendant, and by other acts of defendant. Verdict and judgment were for plaintiffs in the sum of $4,500, and defendant has appealed.

Defendant contends that the court erred in giving plaintiffs' main instruction (No. 1), because it contained hypotheses not supported by the evidence. In determining the sufficiency of the evidence to warrant the giving of the instruction, the evidence must be viewed in the light most favorable to plaintiffs. Rhinelander v. St. Louis-San Francisco Ry. Co., Mo. Sup., 257 S.W.2d 655, 657; Sing v. St. Louis-San Francisco Ry. Co., Mo. Sup., 30 S.W. 2d 37, 43.

Plaintiffs are the owners of a tract of land in Kansas City, North, Clay County, Missouri. The tract extends 1,187 feet east and west, and about 700 feet north and south. It was acquired by plaintiffs in February or March of 1945. At that time Mrs. Fannie S. Campbell owned a tract adjoining plaintiffs' land on the south; both tracts being bounded on the west by Telephone Road, now designated as North Holmes Street. The south tract, which extended 1,187 feet east and west and more than 300 feet north and south, was the higher or dominant tract, and it declined from south to north as did plaintiffs' land. At the extreme west end of the south tract was a hill or ridge, the top of which was several feet above the level of Telephone Road. A witness for defendant said 4 or 5 feet, and plaintiff (Mr.) Belveal said 10 to 15 feet. There were two natural depressions in the south tract, both of which extended northward across the boundary line be-

tween the two tracts, and continued in a northeasterly direction through plaintiffs' land to a "slough" that connected with Rock Creek. One of the depressions crossed the dividing line at a point approximately 275 feet east of Telephone Road, and the other at a point about 600 feet east of that road. Most of the witnesses referred to the easternmost depression as the "east ravine", and to the other as the "west ravine". For the convenience of reference, we will use the same designations hereinafter.

Mr. Belveal testified that the distance from the south or upper end of the east ravine to the south line of plaintiffs' tract was "approximately 150 to 200 feet, possibly more". Two witnesses said the distance was about 300 feet. The testimony shows that the east ravine, prior to its obstruction, was 3 to 5 feet deep at the south end, and that it was 10 to 12 feet deep and 25 to 30 feet wide where it crossed the line between the two tracts. The evidence does not show the distance from the south end of the west ravine to the south line of plaintiffs' land, nor does it show the width or depth of that ravine at any point. In describing the two ravines, Mr. Belveal said in part: "There were two ravines in Fannie Campbell's land the same as in mine; sloped from east to west and west to east in each ravine, and sloped to the north, gradual slope to the north." One of the issues in the case is whether the "east ravine" was a natural watercourse prior to the acts complained of.

As stated, plaintiffs bought the north tract in February or March of 1945. A barbed-wire fence extended along the south line of plaintiffs' property, except the extreme west end thereof. According to Mr. Belveal, this fence was on plaintiffs' land, and "when it came to the stream", it "went right down in" and "then back up". In 1945 or 1946, plaintiffs built a two-story dwelling house, a small guest house, and a two-car garage on their tract, near the southwest corner thereof. They have lived in the two-story house since September, 1946. In 1946 plaintiffs installed a tile drain in that part of the west ravine which traversed their land. Be-

ginning at a point 6 to 8 feet north of the south boundary line of plaintiffs' tract, the drain extended through the west ravine some 500 feet. As we understand the testimony, the drain was made of 12 or 15-inch tile pipes. Mr. Belveal testified that the purpose of the drain was "to carry off surface water coming down from the slope on Fannie Campbell's (land) and from the slope on mine" so that the water would not cut ditches in plaintiffs' land.

Plaintiffs' testimony shows that when they inspected the north tract in the latter part of 1944, with a view to buying it, water was flowing through the east ravine; that the water came from springs on the south (Campbell) tract; that the largest spring was 20 to 25 feet south of the boundary line between the two tracts; that "there were three or four smaller springs on up the ravine" at a place 130 to 150 feet south of said boundary line; that the waters from these springs "followed the ravine" in a northeasterly direction to and across the north tract; and that from the latter part of 1944 until the east ravine was obstructed and the springs covered up in the manner described below, waters from the springs flowed through the east ravine. Plaintiffs' witness, Loughrey, testified that "about 1920" there was a spring on the south tract; that "we used to go through there as boys on horseback and stop at that spring and get drinks of water"; that the spring was south and east of "where the Belveal house is now"; and that the water from the spring flowed through "a gully" in "a northeasterly direction over what is now the Belveal property", and "then into another gully on down into Rock Creek". He further testified that he had not been on the south tract since 1920.

In the spring of 1947, and about three years before the defendant bought the south tract from Mrs. Campbell, plaintiffs constructed an earthen dam across the east ravine for the purpose of creating a "lake" on their land. This dam was located approximately 400 feet north of the south boundary line of plaintiffs' property. It was 150 to 160 feet long (east and west)

and 15 to 18 feet high, the thickness varying from 12 feet at the top to 25 or 30 feet at the base. The evidence shows that earth was removed from the bottom of the east ravine at a point immediately south of the place where the dam was erected, and that this earth (mostly clay) was used to form the dam. Mr. Belveal testified that a 6-foot spillway was installed about 3 feet below the top of the dam, and that "the height of the water" impounded by the dam could be controlled by means of a valve in a 2½-inch pipe which extended north and south through the base of the dam. While the dam itself was 15 to 18 feet high, the distance between the south side of the spillway and the bottom of the ravine, at the place where the earth had been removed, was 26 or 27 feet. The evidence shows that the effect of the maintenance and operation of the dam was to hold back the water that flowed through the east ravine and to create on plaintiffs' land what the plaintiffs and their witnesses called a "lake". The dam, when the impounded water reached the level of its spillway, backed the water up the ravine about 365 feet. Mr. Belveal testified that the impounded water reached the level of the spillway about 90 days after the dam was completed; that there "were one or two light rains during that period, but nothing unusual"; that 5 to 8 acres of plaintiffs' land drained into the lake; that most of the water that "filled up the lake" came from the springs on the Campbell tract; and that the water flowed through the spillway "practically all the time" until the defendant interfered with the source of supply. Part of this testimony was corroborated by Mrs. Belveal.

In the spring of 1948, plaintiffs had a grading contractor, Damon Purcell, construct another earthen dam across the east ravine. According to plaintiffs' evidence, this dam was located 25 or 30 feet north of the south boundary line of plaintiffs' tract. It was about 50 feet long (east and west), and 8 to 10 high. Purcell, who was a witness for defendant, testified that the lake "had filled up completely and had to be lowered" a few feet "so (he) could build that south dam". Mr. Belveal testified that the south dam was "right at the south end of the lake"; that "it had a 2½-inch pipe through there with a valve on it, just like the north dam"; that it was constructed for the purpose of creating "a settling basin and an extra lake to provide regular flow of water down to my lake should it go down a little" in dry weather; that the settling basin thus created was 40 to 50 feet long, 30 to 40 feet wide, and about 7 feet deep; and that about one-third of the settling basin was on the south tract.

Plaintiffs' testimony shows that after "the lake filled up" in the spring or summer of 1947, they had it stocked with fish and fertilized; that they bought 75 to 100 tons of sand and spread it on the banks of the lake; that for a period of about four years they used the lake for swimming and fishing; and that during that period, and prior to the acts complained of, the water in the lake was "nice and clear".

In 1950, defendant bought the south tract from Mrs. Campbell for the purpose of constructing dwelling houses thereon and developing a residential area or subdivision. At that time the land was being used solely for agricultural purposes, and it had been so used since 1947 or 1948. Defendant commenced to develop its property in the fall of 1951. The land was stripped of vegetation and "rough graded". The hill at the west end of the south tract was cut down to the level of Telephone Road, hereinafter called North Holmes Street. Defendant filled up the ravines in its land and constructed the street hereinafter described. Lots were laid out and "rough graded" and dwelling houses were erected thereon. It appears that the work of building the houses started in December, 1951. The "finish grading" was done in the spring of 1952, at which time defendant sodded all of the "front yards" and a part of each "back yard". The development was completed in the fall of 1952. Mr. Belveal testified that when the rains came, in the fall of 1951 and the spring of 1952, loose dirt on defendant's tract was washed onto plaintiffs' land and muddy water drained from defendant's land into plaintiffs' settling basin and lake.

The evidence shows that in developing the south tract defendant constructed thereon a 50-foot macadamized street with concrete curbs. This street extended east and west the full length of the tract, the north side of the street being about 130 feet south of the south boundary line of plaintiffs' tract. In connection with the construction of the street and the grading of certain lots, defendant filled up the east ravine between a point at or near the south or upper end of the ravine and a point about 100 feet south of the south line of plaintiffs' tract, which included that part of the ravine "where the street ran across". After the street was completed, defendant filled up the ravine as far north as the dividing line between the two tracts. There was evidence that, as a result of defendant's operations, the above mentioned springs were covered up. Mr. Belveal testified: "Q. And what happened to the water that had been flowing there, do you know? A. There isn't any water flowing. It was covered up." Plaintiffs' evidence tends to show that during the grading and filling operations one of defendant's bulldozers hit a tree located four to six inches north of plaintiffs' south boundary line; that two or three days thereafter the tree fell over and was destroyed; and that defendant's graders pushed loose dirt across plaintiffs' south boundary line and into their so-called settling basin. Mr. Belveal testified that "the dirt fell down and covered my fence and filled up about half, two-thirds of the settling basin".

Defendant erected a row of houses on each side of the street that extended east and west across the south tract. The lots were so graded that the front part of each lot sloped downward to the street; and the street sloped downward from the east end of the tract and from the west end of the tract to the point where it crossed the dirt fill in the east ravine. Defendant constructed two catch basins at this low point, one in the south side of the street and the other in the north side; the basins being connected by a concrete pipe laid below the surface of the street. An iron grating, about two feet square, was placed over the top of each basin. The openings in the gratings were about four inches wide and six inches long. All of the water flowing into the basins from the street was discharged through one outlet into a depression or ditch immediately north of the street. This ditch extended northward along the boundary line between two lots. One of defendant's witnesses testified that when the east ravine was filled with dirt at that point, the "land on each side was filled up a little bit and so it more or less made a ditch there". According to Mr. Belveal, the north end of the ditch was "quite a ways" from the south boundary line of plaintiffs' land.

The evidence shows that whenever it rained, the water that drained from the front part of each lot into the street, as well as the water that fell upon the street, flowed down the street from the east and from the west into the catch basins described above, thence through the outlet on the north side of the street, and into and through the open ditch, which declined from south to north, and thence to the north into plaintiffs' settling basin and lake. One witness testified that during heavy rains the water ran through the ditch with "terrific force"; and another witness said that on such occasions he saw "water run down there three or four feet deep". Defendant had placed some large rocks in the bottom of the ditch, but the water passed around the rocks and cut channels in the dirt fill as it flowed toward plaintiffs' settling basin, which had been partially filled with loose dirt during the defendant's grading operations. Plaintiffs' testimony shows that said rain or surface water carried with it mud, silt and debris, and deposited the same in their settling basin in such quantities as to fill the basin "to the top"; that thereafter this "thick, muddy stuff" ran over the top of the south dam onto plaintiffs' sand beach and into their lake, which had no source of supply other than surface water after defendant obstructed the east ravine and covered up the springs on the south tract; that this occurred whenever it rained "to any ex-

tent", with the result that the lake was partially filled with mud and debris and the sand beach destroyed. The lake became "a mudhole" and emitted "obnoxious odors". Mrs. Belveal testified that the "lake was positively ruined, wasn't fit for anything". Other evidence will be referred to in the course of the opinion.

Instruction 1, given at the request of plaintiffs, reads as follows:

"The court instructs the jury that if you find and believe from the evidence: 1. That defendant company obstructed, interfered with and obliterated a natural stream or natural water course flowing over and upon defendant's land as such is defined in Instruction No. 2 and that such obstruction, interference and obliteration destroyed the flow of said stream or water course from defendant's land to plaintiffs' land, if you so find; and if you further find that as a result thereof, plaintiffs' lake and land were damaged in that said lake on plaintiffs' land was deprived of the waters of said stream or water course and was thereby caused to dry up and to be changed from a relatively deep, fresh, clear water lake to a shallow, muddy water hole, if you so find;

"2. And, if you further find and believe from the evidence that defendant company, by its own means and construction, collected surface waters at a point on defendant's land, and caused said collected surface waters, together with any and all dirt or debris accumulated therein, to be released or discharged at said point and directed toward plaintiffs' land, if you so find; and, if you further find that as a result thereof, plaintiffs' land, lake, dams, tile drainage systems, and other equipment, or any part thereof, were damaged by the flow of said collected and released surface waters, dirt, or debris over and upon plaintiffs' land, if you so find;

"3. And, if you further find and believe from the evidence that while in the process of its operations on land adjacent to the south of plaintiffs' land, defendant through its agents, servants and employees, without the consent of plaintiffs, caused damage to a tree on plaintiffs' land and shoveled dirt and debris upon plaintiffs' land, if you so find; and if you further find that as a result thereof, plaintiffs' land, lake and tile drainage systems and equipment were damaged;

"Or, if you find and believe from the evidence that all, or any, or one of the happenings, described in Paragraphs 1, 2, and 3, of this instruction, occurred, then your verdict shall be for plaintiffs and against defendant."

As heretofore indicated, defendant contends that the court erred in giving the above instruction. It is conceded that the grounds of recovery hypothesized in paragraphs numbered 1, 2, and 3 were submitted in the alternative or disjunctive, because of the inclusion of the last paragraph of the instruction. With the instruction so drawn, if the submission of any one of such grounds was erroneous, whether for lack of evidence to support it, or for failing to hypothesize essential facts disclosed by the evidence, or because of indefiniteness, then the instruction would be erroneous, since it would be impossible to determine from the verdict returned upon which of the grounds the jury found for plaintiffs and the verdict may have been based upon a ground improperly submitted. Yates v. Manchester, 358 Mo. 894, 217 S.W. 2d 541, 542; Martin v. Springfield City Water Co., Mo.App., 128 S.W.2d 674, 682; Alexander v. Hoenshell, Mo.App., 66 S.W. 2d 164, 169.

Defendant urges first that paragraph 1 of plaintiffs' instruction 1 was erroneous, because there was no evidence from which "the jury could find that any natural watercourse existed on plaintiffs' and defendant's land at the time defendant commenced its operations", citing Happy v. Kenton, 362 Mo. 1156, 1160, 247 S.W.2d 698, 700, where it was said that " * * * Missouri is committed to the doctrine that one may not obstruct a natural watercourse without liability for ensuing damages to others * * *", and that the courts of this state have many times approved the definition of a natural watercourse found in Hoyt

v. City of Hudson, 27 Wis. 656, 661, and quoted in Benson v. Chicago & A. R. Co., 78 Mo. 504, 514, as follows: "There must be a stream usually flowing in a particular direction, though it need not flow continually. It must flow in a definite channel, having a bed, sides or banks, and usually discharge itself into some other stream or body of water. It must be something more than a mere surface drainage over the entire face of a tract of land, occasioned by unusual freshets or other extraordinary causes. It does not include the water flowing in the hollows or ravines in land, which is the mere surface water from rain or melting snow, and is discharged through them from a higher to a lower level, but which at other times are destitute of water. Such hollows or ravines are not in legal contemplation water courses."

Defendant does not attack plaintiffs' instruction 2, which defines a natural watercourse, and it need not be set forth here. It is sufficient to say that the definition in instruction 2 is similar to the one quoted above.

In the instant case, there was evidence tending to show that the east ravine had a well-defined channel with banks; that it extended northward across part of the south tract, thence in a northeasterly direction through plaintiffs' land, and finally connected with a slough that emptied into Rock Creek; and that when the defendant acquired the south tract, and for at least six years prior thereto, the east ravine had a constant source of supply from springs on the south tract. Witness Loughrey testified that there was a spring on the south tract in 1920, but his testimony as to the location of the spring was rather indefinite. As stated, plaintiffs' testimony shows that water was flowing through the east ravine when they inspected the north tract in the latter part of 1944; that the water came from springs on the south tract; that the waters from these springs flowed through the ravine from the latter part of 1944 until the acts complained of; that the water impounded by the north dam reached the level of the spillway about 90 days after the dam was completed; that there "were one or two light rains during that period"; that when the water reached the level of the spillway, the dam backed the water up the east ravine about 365 feet; that most of the water in the lake came from springs on the south tract; that water flowed over the spillway "practically all the time" until the defendant obstructed the ravine and covered up the springs; that for a period of about four years, and prior to the acts complained of, plaintiffs used the lake for swimming and fishing; and that during that period, the water in the lake was clear. Plaintiffs' witness, Young, who lived in one of the houses erected by defendant on the south tract, testified: "There's still springs there. It's wet all the time in through there with springs right now." There was testimony by three witnesses for defendant which tended to corroborate Young's testimony. These witnesses insisted, however, that the springs were merely "wet weather springs".

While the testimony was conflicting in many particulars, we conclude that there was substantial evidence from which the jury could reasonably have found that the east ravine was a natural watercourse at the time in question.

■ Defendant asserts that "the evidence was that prior to 1951 when defendant acquired the land the plaintiffs had already constructed two dams across the ravine and thereby prevented any water which might have been in the ravine on defendant's land from passing onto plaintiffs' land"; that "the plaintiffs were estopped by their actions from asserting or having presented to the jury any instruction authorizing a finding that the defendant obstructed the water course"; and that "they had effectually in fact and in law precluded anyone from assuming or determining that a water course existed in that locality". No such point is presented under defendant's "Points and Authorities". The statements quoted, and other similar statements, appear under the caption "Argument", without citation of authorities; and these statements are intermingled with defend-

ant's argument in support of the contention that there was no evidence from which the jury could find that the east ravine was a natural watercourse at the time in question. A point is not properly presented for review if advanced for the first time in the argument. Supreme Court Rule 1.08, 42 V.A. M.S.; Jones v. Giannola, Mo.App., 252 S.W.2d 660, 663, and cases cited. See also Ambrose v. M. F. A. Co-Operative Ass'n, Mo.Sup., 266 S.W.2d 647. We are of the opinion, however, that in view of the evidence and the issues raised and decided there is no merit in defendant's contention.

■ As appears above, paragraph 2 of instruction 1 hypothesized for the jury that "defendant company, by its own means and construction, collected surface waters at a point on defendant's land, and caused said collected surface waters, together with any and all dirt or debris accumulated therein, to be released or discharged at said point and directed toward plaintiffs' land * * *". The general rule relating to the rights and duties of landowners with respect to surface water has been stated as follows: "The common-law doctrine treats such water as a 'common enemy', and permits a landowner to protect his own property by whatever means he sees fit, even though he throws the water upon the land of another. Missouri has followed this doctrine with a limitation which provides that the owner of the higher land cannot collect the surface water and then cast it upon the servient estate." Casanover v. Villanova Realty Co., Mo.App., 209 S.W.2d 556, 558. In Tucker v. Hagan, Mo.App., 300 S.W. 301, 303, the court said: "It is not permissible for the dominant proprietor, in the exercise of his undoubted right to fight against surface water, to collect the same in a large body, conduct it by artificial means, as by a ditch, and discharge it upon the servient estate in an increased volume." To the same effect are Goll v. Chicago & Alton R. Co., 271 Mo. 655, 197 S.W. 244; Anderson v. City of Jefferson, Mo.App., 262 S.W.2d 169, 171. See Vollrath v. Wabash R. Co., D.C.Mo., 65 F.Supp. 766, 771, where the court reviewed many Missouri cases.

■ Defendant insists that paragraph 2 of instruction 1 was prejudicially erroneous. First it is argued that there was no evidence "as to a difference in the volume of surface water discharged into said ravine toward plaintiffs' land before and after defendant's operations, all of the evidence as to the volume of water being limited to the manner in which the water was discharged after defendant had completed its operations and as to the dirt and silt contained therein at that time"; and that there was no evidence "that surface water was discharged toward plaintiffs' land at a different point". Defendant states that "all of the evidence on both of these points was to the contrary"; that "the water, surface or otherwise, was discharged at the same point both before and after defendant's operations, and the amount of water draining across to plaintiffs' lake was the same or less after defendant had graded and skinned its own property". In this connection defendant cites Casanover v. Villanova Realty Co., supra. We find it difficult to determine exactly what is meant by this argument. It does appear, however, that defendant referred to the testimony of its own witnesses in stating that all of the evidence was "to the contrary". We must, of course, disregard defendant's evidence unless it aids the plaintiffs' case.

The evidence shows that when defendant commenced its operations, some of the water that fell on the south tract flowed into the two ravines in that tract, thence northward through the ravines toward plaintiffs' land, and that such water entered the ravines in a diffused condition. Plaintiffs' evidence shows that at that time some of the surface water on the south tract flowed northward onto plaintiffs' land without passing through the ravines. Defendant filled both ravines with dirt, and after it graded the lots, constructed the street, installed the catch basins, etc., surface water flowed down the street into the catch basins, thence through the outlet and the open ditch, and thence northward into plaintiffs' settling basin and lake. All of the water that fell on the south tract did

not drain into the catch basins; some of it ran northward in a diffused condition onto plaintiffs' land. We think it is sufficient to say, without extended discussion of all of the pertinent evidence, that there was substantial evidence from which a jury could reasonably find that defendant collected surface water on its land and discharged the water in a concentrated volume onto plaintiffs' land and into their settling basin and lake, and that mud, silt and debris gathered by such water was deposited in the basin and lake.

In the Casanover case, supra, cited by defendant, the defendant started to develop its property by stripping it of vegetation, filling a ravine, and grading it to a smooth slope. There were some heavy rains that spring and the water poured down the bare clay hillside into the back yards of the plaintiffs, carrying with it mud and silt. Plaintiffs sought to enjoin the defendant from permitting the flow of surface water and silt onto their land, and to recover damages for the injury to their property caused by the water and silt and damages by reason of a trespass. The trial court denied an injunction and restricted the damages awarded to the injuries caused by the trespass. In affirming the judgment the court said: "The defendant could, of course, use its property in any lawful manner and for any lawful purpose, and it had the right, absent legal restrictions to the contrary, to alter the grade. It has done that and in skinning this hillside of grass, vegetation, and topsoil it has left a barren clay slope which no longer absorbs the rain that falls but lets it flow freely toward the plaintiffs' land below. This in itself does not impose any liability upon the defendant for its land is higher and is the dominant estate as to surface drainage and the plaintiffs' land being lower is the servient estate and the natural recipient of the flowing surface water." 209 S.W.2d loc. cit. 558. This case does not support the argument of defendant set forth in the second preceding paragraph, for the court said: "There is no contention here that the defendant collected the surface water in any fashion * * *."

Defendant also relies upon Thompson v. Chicago, M. & St. P. R. Co., 137 Mo.App. 62, 119 S.W. 509, 512, where this court said, in reversing a judgment for plaintiff, that the rule which forbids the dominant proprietor from collecting surface water in a body and precipitating it on the servient estate does not apply to cases where the diversion "is merely incidental to the improvement of the premises in a proper manner." In the instant case, the construction of the catch basins and the outlet on the north side of the street was not a mere incident to the improvement of defendant's property so as to bring it within the rule in the Thompson case. The two cases are distinguishable on the facts.

Defendant contends that instruction 1 was erroneous because: (1) "there was no proof that defendant collected and discharged surface water upon plaintiffs' land 'unnecessarily'", and (2) paragraph 2 of the instruction failed to require the jury to find "that defendant 'unnecessarily' collected and discharged surface water upon plaintiffs' land", citing Keener v. Sharp, 341 Mo. 1192, 111 S.W.2d 118, 120, where the court quoted from the opinion in Schalk v. Inter-River Drainage Dist., Mo.App., 226 S.W. 277, 278, as follows: "The law seems to be well settled in Missouri that surface water is a common enemy which every man may ward off his land and thus throw it on an adjacent or lower owner, provided he does not, in warding it off, *unnecessarily* collect it and discharge it to the damage of his neighbor." (Italics ours.) The Keener and Schalk cases involved the obstruction of natural watercourses. They do not support defendant's position, and we have found no case that does. "Unnecessarily" is a comprehensive, flexible term, and what the court intended by the use of the term is not disclosed. There is no merit in defendant's contention. Clark v. City of Springfield, Mo.App., 241 S.W.2d 100, 108.

Defendant further contends that instruction 1 was erroneous because paragraph 2 thereof "in effect authorizes plaintiffs to recover if the jury find only that surface waters did flow onto plaintiffs' land, carry-

ing with it mud and silt"; citing Casanover v. Villanova Realty Co., supra. We do not agree. There was nothing in the instruction that authorized the jury to base a verdict for plaintiffs on such a finding.

Defendant contends that the court erred in giving plaintiffs' instruction 4, as follows: "The court instructs the jury that if you find for plaintiffs, the measure of damage will be the difference in the reasonable market value of plaintiffs' land immediately before the obstruction and obliteration of the natural stream or water course if you find and believe the same to have been a natural stream or water course as defined in Instruction No. 2 herein and further find that the same was obstructed and obliterated; the collection and release of surface waters, if so, together with dirt and debris at one point, directed toward plaintiffs' land, if so, coupled with entry upon plaintiffs' land by defendant, its agents and equipment, if so, including damage to a tree on plaintiffs' land, if so, and the shoveling of dirt and debris on and upon plaintiffs' land; and the market value of plaintiffs' land immediately after said acts, *or any of them, if you so find.*" (Italics ours.)

■ In actions for injuries to real property by the obstruction of a natural watercourse, or by the diversion, accumulation, or discharge of surface waters, the measure of damages is the same as in other cases of injuries to such property. 56 Am. Jur., Waters, Sec. 40, p. 526, Sec. 87, p. 571. "When the damage to real estate is permanent and the injuries of a major character, the proper measure of damages is the difference between the market value of the (property) immediately before and after the injuries occurred and there must be evidence of such values." Cirese v. Spitcaufsky, Mo.App., 265 S.W.2d 753, 758. If, however, the damaged property can be restored to its former condition, and, "the amount of damage is insignificant, as compared to the value of the property as a whole and involves only a small part thereof," the reasonable cost of repairing the property may be shown "as a basis for determining the value to plaintiff of the property before and after the accident." Gulf, M. & O. R. Co. v. Smith-Brennan Pile Co., Mo.App., 223 S.W.2d 100, 104, 105. In the instant case, there was no evidence as to the reasonable cost of repairing the property.

■ As appears above, plaintiffs' damage instruction (No. 4) hypothesized certain acts of defendant and told the jury that if they found for plaintiffs the measure of damages would be the difference between the market value of plaintiffs' land immediately before and "immediately after said acts, *or any of them*". (Italics ours.) Defendant says that the instruction was prejudicially erroneous, because a jury reading this instruction in connection with plaintiffs' main instruction (No. 1) would understand that they were to apply the measure of damages set forth in instruction 4 even though they found that defendant was guilty of only one of the hypothesized acts; and defendant points out that the damage caused by such act might be temporary, in which event it would be improper to apply the measure of damages set forth in instruction 4. We agree.

Plaintiffs concede that all of the damage to their land was temporary, except the damage resulting from the "loss of the lake". They contend, however, that it "would be difficult and impractical to submit to a jury an instruction directing the jury to apply one measure of damages, the cost of restoration, to some of the items of damage, and then to apply a different measure, the difference in market value, to the other items of damage"; and that for this reason "the courts do not require it", citing Casanover v. Villanova Realty Co., supra. There is no merit in this contention. The Casanover case does not support plaintiffs' contention that in the instant case the jury was properly instructed as to the measure of damages.

For the error in giving plaintiffs' instruction 4, the judgment should be reversed and the cause remanded; and the commissioner so recommends.

SPERRY, C., concurs.

PER CURIAM.

The foregoing opinion of BOUR, C., is adopted as the opinion of the court. The judgment is reversed and the cause remanded.

DEW, P. J., and BROADDUS, J., concur.

CAVE, Judge (concurring).

I concur in the result reached in the BOUR opinion; but I do not want to be understood as approving plaintiffs' instruction No. 1 as drawn. The first three paragraphs of the instruction clearly submit the question of liability in the *conjunctive,* but the effect of the last clause, beginning with the word "Or", is confusing to me. Whether that clause was inserted for the purpose of clarifying the submissions in the conjunctive, or whether the effect is to convert the original conjunctive submissions into *disjunctive* submissions, is not clear. It certainly adds to the uncertainty of the elements of damage submitted in instruction No. 4.