**Earl SPAIN and Wilma Spain, Plaintiffs-Respondents,**

**v.**

**The CITY OF CAPE GIRARDEAU, Missouri, a municipal corporation, and Dorothy Rickard, Defendants,**

**The City of Cape Girardeau, Missouri, a municipal corporation, Defendant-Appellant.**

**No. 34240.**

Missouri Court of Appeals, St. Louis District, Division Two.

Aug. 15, 1972.

Howard C. Wright, Jr., City Atty., Cape Girardeau, for defendant-appellant.

Manuel Drumm, Sikeston, for defendant Rickard.

Briney, Welborn & Spain, Bloomfield, McHaney & Welman, Gary B. Ryan, Kennett, for plaintiffs-respondents.

SIMEONE, Judge.

Appeal by the City of Cape Girardeau from a verdict and judgment of $2,500 rendered against it in a suit brought by Earl and Wilma Spain, plaintiffs-respondents, for surface water damage to their property, allegedly caused by the resurfacing of a city street.

The plaintiffs-respondents own a tract of land in an area of Cape Girardeau known as Rodney Vista Park. They own the south one-half of lot 15, block 2. The Spains originally brought suit against the City and one Rickard, the owner of a lot west of them. The plaintiffs alleged in their petition that the City "constructed a concrete street to the west . . . known as East Rodney Drive which runs in a north and south direction. That said street is a curbed street and is constructed in a hilly area. That as a result of this street and other streets in the area waters from a large area are accumulated and carried to a point on East Rodney Drive approximately seventy-five (75) yards west of the plaintiffs' land," where they are "collected and impounded and then discharged in concentrated and distructive (sic) quantities by means of a concrete culvert onto the lands of defendant, Dorthy (sic) Rickard" where the waters are further carried by a ditch lined with bricks and then discharged onto the plaintiffs' land.

There were numerous witnesses for both parties. The evidence shows that a street known as East Rodney Drive runs in a north-south direction and lies west of the Spains' property. The Spains' property lies east of Rodney Vista Boulevard, which also runs north and south and parallel with East Rodney Drive, all in the area of Rodney Vista Park. A third street—Adeline Avenue runs east and west and makes a T-intersection with East Rodney Drive, almost due west of the Spains' property.

In 1963, the City improved East Rodney Drive. The street had been a twenty foot blacktop street, but was improved to a thir-

ty foot concrete street with curbs, and as a result of the surface and curbing, water that had previously been absorbed in the ground was now gathered in the street and ran to the intersection of East Rodney and Adeline where it was collected in "catch basins" and deposited on the east side of East Rodney by an eighteen inch pipe. The water then ran down across the Rickard property which was just west of the Spains' property and due east of the intersection of East Rodney and Adeline.

In 1961, East Rodney was a blacktop street without curbs, without catch basins and had a six to eight inch pipe which went across the street, presumably east of East Rodney Drive. East Rodney is "hilly" and is about twelve to fifteen feet higher in elevation than Rodney Vista.

As stated, in 1963, the City constructed the concrete street and curbs; it also put in two catch basins about 140 feet west of the property of the Skaggs, the plaintiffs' next door neighbors. As a result, when it rains, water goes into the pipe "by Mrs. Rickard's," and comes down through her lawn and spreads out and flows down on the Skaggs' and Spains' property. On the property of Mrs. Rickard, there is a brick-lined ditch or trough about two-three feet across for the water to run on for about thirty feet and when the water gets to the end of this brick-lined trough it spreads out in the Spains' yard and frequently enters their basement. One of the witnesses, Virgil Skaggs, testified that before the City had widened East Rodney Drive, put in curbs, catch basins and open-ended pipe, he had no water problem. Prior to 1963 the Skaggs' and the Spains' property would get a "natural amount" of draining, but wouldn't get much of it because the "ground absorbed it. . . ."

Earl Spain testified that he purchased the home at 905 Rodney Vista in 1966 from Emory Lincecum who had himself bought the property in 1962. When it rains, Spain testified, the water "comes down and gets all over my yard," "about six to eight maybe ten inches" in depth and "practically every time it comes a rain" water gets into the basement. Water comes in through the windows, at the west side of the house and gets "ten to twelve inches deep." As a result plaintiffs had to disconnect the furnace for several hours at a time leaving them without heat and deprived them of the use of appliances located in the basement. The water would often come at a rapid speed.

In an attempt to stem the flow, plaintiffs hauled about nine truckloads of dirt but it washed away. They also built a wall down the side of the house beside the Skaggs house and built a ditch between their home and the Skaggs. Spain testified that the market value of his home without the "water problem" was $13,500 and with the "water problem" he figured "$9,000 would be a nice price for it." Although the Spains purchased the property directly from Mr. Lincecum, they did not talk to him or ask about "any water problem."

Other witnesses for the plaintiffs corroborated much of the testimony of Mr. Spain and Mr. Skaggs. Mrs. Spain testified as to the severity of the problem and also testified that "those conditions that existed were in existence at the time" of the purchase. Other witnesses testified that water in the Spains' basement was "halfway" up to the knees.

The prior owner, Lincecum, testified that the City made the street wider and "curbed" it. Other than one time, he had no water problems prior to 1963 but that after the work was done on East Rodney he began "to have water problems"; the water came in all four window wells and that the water would take anything "that was laying in the yard, baseball bats, wheelbarrow, or anything else." At the time the Spains purchased the house the basement walls were slightly discolored. Mr. Lincecum did not inform the Spains about the water problem nor did they ask Mr. Lincecum about it. He sold the house

for he "believed" $12,500 or $12,300 and he sold it "mainly" because of the water problems.

At the close of the plaintiffs' case, motions for directed verdicts were made by both the City and Rickard. The motion of Rickard was sustained, but the motion of the City was overruled.

The City's engineer testified that the lowest elevation on East Rodney Drive was at a point on the north side of Adeline Avenue at the intersection with East Rodney Drive and that there were two catch basins at that point. The "drop" between East Rodney Drive and Rodney Vista Boulevard is twenty feet, and the area that drains to the intersection of Adeline and East Rodney is some four and two-tenths acres. He testified that the effect of paving the street was to increase the flow.

The former city superintendent for public works indicated that the terrain has changed very little since 1955, and that prior to 1963 East Rodney had open ditches on both sides, that the width of these ditches varied depending on the location of the ditch. The ditches channeled water to the intersection of Adeline and East Rodney and a catch basin on the northeast corner of East Rodney and Adeline and then discharged water through a pipe to the valley gutter. Prior to 1963, the area immediately east of the intersection was an open ditch that carried water, but in 1963 pipes were relocated and the outlet to the pipe that discharged the water was changed from corrugated to concrete. That during his tenure with the City the water that flowed from the intersection of Adeline Avenue and East Rodney Drive could go no other place.

Other witnesses for the City described the condition and said that the drainage has been the same for many years.

At the close of the case, the court gave a number of instructions. Instruction No. 4 stated:

"If you find the issues in favor of plaintiffs, then you must award the plaintiffs such sum as you believe will fairly and justly compensate the plaintiffs for any damage you believe they sustained as a direct result of the occurrence mentioned in the evidence. M.A. I. 4.01 Tendered by Plaintiffs"

The court also gave Instruction No. 2:

"Your verdict must be for the plaintiffs if you believe:

"First, plaintiffs are the owners of the property mentioned in the evidence, and

"Second, defendant collected surface water and cast it in concentrated and destructive quantities at one point onto the land of plaintiffs, and

"Third, as a direct result of such act plaintiffs' property was damaged. Not in M.A.I. Tendered by Plaintiffs"

On January 17, 1971, the jury returned a verdict for the Spains in an amount of $2,500. After a post trial motion by the City, the City perfected its appeal.

The City contends: (1) the court erred in refusing defendant's motion for a directed verdict because the evidence shows that the conditions about which the Spains complain existed prior to the time they purchased the property because the value of the land had already been diminished and they took the property subject to the conditions and hence they are not entitled to damages; (2) the court erred in giving Instruction No. 4 because the evidence of the plaintiffs showed that the damage was based on the value of the property with the conditions existing and the value of the property without the condition and hence the instruction did not properly instruct the jury on the correct measure of damages; (3) the court erred in giving Instruction No. 2 because the instruction required a verdict for the plaintiffs regardless of whether or not the City increased the flow of water by the street construction and hence imposed an absolute liability on the City contrary to law, and (4)

that the court erred in not granting a new trial because the verdict was excessive.

The respondents-Spains, on the other hand, seek to uphold the rulings of the trial court and the verdict contending that the action of the City in improving the street was a continuing wrong for which damages are recoverable by a subsequent purchaser and that Instruction No. 4 was proper because the "nuisance" was temporary and abatable and hence the measure of damage is not the difference between the reasonable market value before and after the action of the City. The Spains also point out that the City is responsible for damage done to the land if it collects surface water and casts it in concentrated and destructive quantities onto a landowner.

■ At the time this cause was tried in January, 1971, the parties did not have the benefit of the opinion of this court, decided October 26, 1971—Skaggs v. City of Cape Girardeau, Mo.App., 472 S.W.2d 870. In that decision an instruction almost identical to Instruction No. 2 herein was given and this court held the instruction erroneous as not applying the proper theory relative to liability for surface water. For that error this court reversed. But, we went on to hold that " . . . liability can be determined here only upon the negligence of defendant city, if its negligence be pleaded and proved, or upon the city exceeding the natural capacity of a drainway (which in itself seems to be an act of negligence), if one is shown to exist in the area of plaintiffs' property. Such additional facts must be established by the pleading and the evidence, and, if so established, must be hypothesized in plaintiffs' verdict-directing instruction, including in a negligence submission a determi-

nation that the defendant was thereby negligent." *Skaggs, supra,* l. c. 875 [2, 3].

Because of the error in giving Instruction No. 2 we must reverse, and because of the reasons which follow we also remand this cause for further proceedings.

■ *Skaggs, supra,* discussed the law of Missouri relating to surface water. Missouri rejects the extremes represented on one hand by the civil law rule which prohibits the upper landowner from doing anything to change the natural system of drainage so as to increase the natural burden upon the landowner below, and on the other, by the common enemy doctrine, which authorizes the landowner to fend off surface water without regard to the consequences of others. Missouri, instead follows a modified version of the common enemy doctrine.[1]

The Missouri doctrine is succinctly stated in Haferkamp v. City of Rock Hill, Mo.Sup., 316 S.W.2d 620, 625–626; " . . . it was never intended that the volume and flow of surface water onto neighboring property could not be increased or accelerated under any circumstance . . . [W]ithout attempting to state precisely its limits it may be said that the rule is, in substance, that a landowner in the reasonable use and development of his land may drain it by building thereon sewers, gutters and such other artificial water channels for the purpose of carrying off the surface waters onto a 'natural surface-water channel' (see Todd v. York County, 72 Neb. 207, 100 N.W. 299, 66 L.R.A. 561) located on his property without liability to the owner of neighboring land, even though such method of ridding his property of surface water accelerates and increases the flow thereof, provided that he acts without negligence, and provided further that

1. *Skaggs, supra,* l. c. 872; Annot., Modern Status of Rules governing Interference with Drainage of Surface Waters, 59 A.L.R.2d 421; Davis and Snodgrass, The Law of Surface Water in Missouri, 24 Mo.L.Rev. 137, 281; Keener v. Sharp,

341 Mo. 1192, 111 S.W.2d 118. At one time Missouri followed the civil law rule but later adopted the present law—see discussion in White v. Wabash R. Co., 240 Mo.App. 344, 207 S.W.2d 505, 508–509.

he does not exceed the natural capacity of the drainway to the damage of neighboring property."[2]

In *Haferkamp, supra,* in an action by property owners against the city and subdivision developers for the discharge of surface waters on plaintiffs' property, the instruction given by the trial court authorized recovery if the defendants' construction activities had increased in any amount the volume and rate of flow of surface water in the natural drainway to the damage of plaintiffs' property. The Supreme Court held this instruction to be based upon an erroneous theory of liability. Given Missouri's adherence to the modified common enemy doctrine, defendants could not be held absolutely liable for merely increasing the flow of surface water in its natural drainway. The Supreme Court, in reversing, also remanded for a new trial since the evidence did "not establish that in no event could the plaintiffs make a submissible case against . . . [the defendants] . . . if the evidence in support of a correct theory was fully developed." 316 S.W.2d 1. c. 628–629.

In *Skaggs* we followed *Haferkamp* and held that the giving of the erroneous instruction required reversal, but as in *Haferkamp,* we refused to direct the sustaining of defendant's motion for directed verdict. Rather, as stated, we remanded for a new trial.

Were the factual situation in the present case identical to that in *Haferkamp* or *Skaggs,* those cases would compel reversal and remand without further discussion. However, in the instant case, an additional element is present in that defendant City made the improvements which are alleged to be the cause of the increased flow of surface water in 1963 when the Spains' property was owned by Mr. Lincecum. Relying on this, the City urges that the trial court erred in refusing its motion for directed verdict because the plaintiffs were subject to the conditions which already existed at the time of the purchase and the plaintiffs purchased the property at a diminished value. In essence, the City contends that the plaintiffs, as subsequent purchasers of the property, have no claim and are not entitled to recover damages for the pre-existing condition. Defendant takes the position that the conditions amount to a permanent nuisance or are analagous to a condemnation situation.

■ Therefore, the issue presented, which distinguishes this case from *Skaggs* is whether a subsequent purchaser of property may maintain a claim against the City for allegedly increasing the flow of water to the damage of neighboring property. The determination of this issue hinges upon whether the improvement of East Rodney Drive and the allegedly resultant increased water flow be considered a "permanent" or a "continuing or temporary" condition or nuisance. If the nuisance is "permanent" then it has been held that there is but one cause of action and a subsequent purchaser cannot maintain an action. But if the nuisance is "temporary, continuing or abatable," a subsequent purchaser has a claim for damages occurring after the purchase.[3]

Whether a particular nuisance is "permanent" or "temporary, continuing or abatable" is one of the most baffling areas of the law. These terms are, in reality, often only short-hand conclusions to determine the outcome of a particular case

2. See also Blackburn v. Gaydou, 241 Mo. App. 917, 245 S.W.2d 161; Casanover v. Villanova Realty Co., Mo.App., 209 S.W. 2d 556; Polich v. Hermann, Mo.App., 219 S.W.2d 849.

3. See cases collected in 59 L.R.A. 817, 901–903; 58 Am.Jur.2d, Nuisances, § 105, at 665–666; Hayes v. St. Louis & S. F. R. Co., 177 Mo.App. 201, 162 S.W. 266; City of Harrisonville v. W. S. Dickey Clay Mfg. Co., 289 U.S. 334, 341, 53 S.Ct. 602, 77 L.Ed. 1208; Conestee Mills v. City of Greenville, 160 S.C. 10, 158 S.E. 113, 75 A.L.R. 519; Smith v. City of Sedalia, 152 Mo. 283, 53 S.W. 907, 911.

or the legal effects of certain defenses, such as the statute of limitations. [4] Nevertheless, the characterization of a nuisance as permanent or temporary may have important consequences in determining the existence of a cause of action or the proper measure of damages.

The distinctions were discussed in Shelley v. Ozark Pipe Line Corporation, 327 Mo. 238, 37 S.W.2d 518, 75 A.L.R. 1316, in which a pipe line from which oil leaked was held to constitute a temporary nuisance. The court noted that the characterization of a nuisance as permanent or temporary is sometimes difficult although the essential distinguishing factor, abatability, may be easily stated. The court did state one constant; that a nuisance created by negligence is a temporary one. "In order for a nuisance to be permanent, it is usually necessary that the nuisance be created by the inherent *character* of a structure or business and that its lawful and necessary operation creates a permanent injury. Where, however, the structure or character of the business, when properly conducted and operated, does not constitute a nuisance, but only becomes such through negligence, then the nuisance or injury is temporary and abatable . . . ." 37 S.W.2d at 519.

Courts have had great difficulty in determining when a particular act, condition or nuisance is permanent or temporary. One test often used is that a permanent nuisance is one of such a character that the action at once and necessarily produces all the damage which can ever result or the whole of the injury results from the original tortious act.[5] Courts also

have difficulty in determining whether it is the character of the source or cause of the injury or the injury sustained, regardless of the character of the source which distinguishes the permanent or temporary character of the nuisance.[6]

It has been held that a municipal sewer system is not inherently a permanent nuisance so that all damages sustained must be recovered in a single action. For many years the appellate courts of Missouri held that a municipal sewer system constituted a permanent nuisance and all damages sustained by any landowner had to be recovered in a single action.[7] But later decisions recognize that such landowners may recover damages resulting from a temporary nuisance upon evidence from which the triers of fact may fairly and reasonably infer that it would have been scientifically possible and reasonably practicable for the municipality to have abated the nuisance.[8]

In several cases the overflow of surface water or sewage water has been held to constitute a temporary and not a permanent nuisance. Clark v. City of Springfield, Mo.App., 241 S.W.2d 100; Kelly v. City of Cape Girardeau, 227 Mo.App. 730, 60 S.W.2d 84.

■ Whether a condition or nuisance is to be treated as permanent or temporary, affects to a large degree the proper measure of damages. The proper measure of damages for a permanent nuisance is the difference between the value before and after the injury, or the diminution in the market value of the property.[9] Stewart v. City of Marshfield, Mo.App., 431 S.W.2d

---

4. For discussion, see McCormick, Damages, § 127, pp. 500–515.

5. See discussion in 58 Am.Jur.2d, Nuisances, § 117.

6. Compare Hayes v. St. Louis and S. F. R. Co., *supra*, and Conestee Mills v. City of Greenville, *supra*.

7. Stewart v. City of Springfield, 350 Mo. 234, 239, 165 S.W.2d 626; Riggs v. City

of Springfield, 344 Mo. 420, 126 S.W.2d 1144.

8. Flanigan v. City of Springfield, Mo., 360 S.W.2d 700, 703–704; Hillhouse v. City of Aurora, Mo.App., 316 S.W.2d 883.

9. Curtis v. Fruin-Colnon Contracting Co., 363 Mo. 676, 253 S.W.2d 158 (trespass for cracking foundation—permanent); Faust v. Pope, 132 Mo.App. 287, 111

819, involved an appropriation of a stream for sewer purposes; the court stressed that the action was one for a permanent nuisance and the city had the right to appropriate a stream for sewer purposes. In such a posture the proper instruction on the measure of damages was MAI 9.02 rather than 4.01.

■ However, if the nuisance is temporary, the proper measure of damages is not the diminution in the value, but the "depreciation of the rental or usuable value during the continuance of the injury." Bartlett v. Hume-Sinclair Coal Mining Co., Mo.App., 351 S.W.2d 214, 1. c. 217; Foncannon v. City of Kirksville, 88 Mo.App. 279.

The underlying policy reason for applying such a measure of damages in the case of a temporary nuisance is that the plaintiff should not be permitted to recover future damages that may never be sustained, while the defendant "should not be required to pay for a permanent injury on the theory that he will continue to illegally inflict injury upon plaintiff." *Shelley, supra*, 37 S.W.2d at 521. Moreover, where there is any doubt as to the character of the nuisance the judicial tendency is to treat it as temporary. "In all cases of doubt respecting the permanency of the injury, the courts are inclined to favor the right to bring successive actions. Otherwise, the effect would be to give the defendant, because of his wrongful act, the right to continue the wrong; a right equivalent to an easement." *Shelley, supra*, 37 S.W.2d at 521; Blackburn v. Gaydou, 241 Mo.App. 917, 245 S.W.2d 161.

Appellant City urges that the trial court erred in refusing to direct a verdict because the evidence showed that the conditions "about which they complain already existed . . ." But the real question is not that the condition existed at the time of the purchase but whether the condition or nuisance is permanent or temporary.

S.W. 878; Peters v. Shull, Mo.App., 379 S.W.2d 837 (changing grade of street);

Appellant relies on City of St. Louis v. Moehlenhoff, Mo.App., 322 S.W.2d 155 and Whitecotton v. St. Louis & H. R. Co., 104 Mo.App. 65, 78 S.W. 318. *Moehlenhoff* involved an action by the city for the assessment of damages to abutting owners for the change in grade of a street. *Whitecotton* involved an action against a railroad for the value of a strip of ground used by it as a right-of-way. Both decisions involved situations akin to a permanent nuisance—all damages were at once produced by the act or condition. The City also relies on Stewart v. City of Marshfield, *supra*. There the action was brought for damages for the appropriation of a stream for sewer purposes and the court stressed that the action was brought for a permanent nuisance. The only issue involved was the appropriateness of the damage instruction. No issue was present as to whether the nuisance was permanent or temporary. 431 S.W.2d 1. c. 821. Hence, under the facts the proper instruction on the measure of damages was not the one given (MAI 4.01) but rather MAI 9.02.

Other cases relied upon by the appellant such as Turner v. Missouri Pac. R. Co., 130 Mo.App. 535, 109 S.W. 101 and State ex rel. State Highway Commission v. Houchens, Mo.App., 235 S.W.2d 97, clearly involved situations akin to a permanent nuisance since the act or nuisance at once caused all the possible damage. In Faust v. Pope, *supra,* the action was for damages for one permanent act and one injury to property, hence the measure of damages was the diminution in the value of the property. In Peters v. Shull, *supra,* the court premised its holding on the ground that "When the damage to real estate is permanent and the injuries are of a major character, the proper measure of damages is the difference between the market value of the property immediately before and immediately after the injuries occurred." 379 S.W.2d, 1. c. 841 [6].

Belveal v. H. B. C. Development Co., Mo.App., 279 S.W.2d 545.

**506**

From these and many other decisions, the distinctions between permanent and continuing or temporary nuisances are not always clearly delineated. In many instances, the distinction depends upon the particular facts, the measure of damages whether the condition is negligently operated or whether it is reasonably practicable for the condition to be abated. Without attempting to reconcile all the factual situations and decisions, we believe it to be clear for the purposes of this case that if the nuisance becomes such through negligence and, as in more recent decisions, the nuisance may reasonably and practicably be abated, the nuisance or condition is not of a permanent character so as to preclude a subsequent purchaser from maintaining an action but rather constitutes a temporary nuisance for which damages for the depreciation in the usable value of the property are recoverable. Flanigan v. City of Springfield, *supra*; Skaggs, *supra*. The state of the record here does not fully and completely reflect whether the condition is reasonably and practicably abatable by the City and hence we remand for further proceedings. This issue is for the jury to determine.

If the plaintiffs are able to produce evidence that the nuisance allegedly resulting from the improvements made by the City were caused either by negligence on the part of the City or that the City exceeded the natural capacity of the drainway and that the City could reasonably and practicably abate the condition which allegedly caused the overflow of surface water, the plaintiffs, although they are subsequent purchasers, should not be foreclosed by directed verdict.

We therefore dispose of this cause as we did in *Skaggs, supra*. "Since the evidence does not establish that in no event plaintiffs could make a submissible case against the defendant city if the evidence in support of a correct theory was fully developed, we refuse to reverse and to direct the sustaining of the motion for directed verdict at the close of the evidence. Rath-

er, we remand for new trial . . ." *Skaggs, supra,* 472 S.W.2d l. c. 875.

In the event of a new trial, Instruction No. 4 would be a proper instruction to determine the measure of damages sustained for the depreciation in the usable value of the property.

The judgment is reversed and the cause remanded.

DOWD, P. J., and SMITH, J., concur.