**H. A. KELSO and Dora Dee Kelso, Respondents,**

**v.**

**C. B. K. AGRONOMICS, INC., Appellant.**

**No. KCD26168.**

Missouri Court of Appeals, Kansas City District.

May 6, 1974.

Motion for Rehearing and/or Transfer to Supreme Court Denied June 3, 1974.

Application Denied July 22, 1974.

712

---

Jack G. Beamer, McKenzie, Williams, Merrick, Beamer & Wells, Kansas City, for appellant.

Morris, Foust, Moudy & Beckett, Max W. Foust and Duke W. Ponick, Jr., Kansas City, and Donald B. Russell, Nevada, for respondents.

Before DIXON, C. J., SOMERVILLE and WASSERSTROM, JJ., and WILLIAM J. MARSH, Special Judge.

DIXON, Chief Judge.

This appeal arises from a jury verdict awarding plaintiffs damages to their farm real estate as a consequence of alleged flooding. Plaintiffs, upstream owners of a large acreage, claimed permanent damages to their farm and real estate by reason of the construction of a reinforced concrete structure utilized as a bridge across the Little Osage River at the site of defendant's farm operation downstream. The defendant's appeal raises issues of the submissibility of plaintiffs' case, error in instructions, admission and exclusion of evidence, a departure from plaintiffs' pleading and proof on submission, and excessiveness of the verdict. Trial proceedings in four volumes of transcripts with over 150 exhibits delineate an extremely complicated fact situation. Attempting to make this opinion of reasonable length, a general statement of the factual background will be made; and as the contentions require, more detailed facts will be stated in the course of the opinion.

Orientation with the general geographic situation is necessary for understanding of the problems in this case. The lands in question are located in northern Vernon County and east of 71 Highway as it runs north and south through Vernon County. At that point, the Little Osage River, flowing generally easterly from Kansas and through Vernon County, joins with the Marmaton River which lies to the south and runs generally east and then northerly to join the Little Osage. At their confluence, they are variously called the Marmaton or the Little Osage River from that point to their juncture with the Marais des Cygnes River which flows generally southeast through Bates County, joining the Marmaton and Little Osage at a point east of the area we are primarily concerned with. After the confluence of these streams, the resulting river is referred to as the Osage River which flows generally east and a little north until it reaches the Lake of the Ozarks in central Missouri. One other flowage must be mentioned. There exists a drainage ditch, referred to as the Marais des Cygnes Drainage Ditch, running southeasterly through Bates County; and when it enters Vernon County, turns and flows easterly to meet with the Osage River near Schell City. Thus, the rivers described form a rough "V" as they approach their ultimate joinder at Schell City, the Marmaton and Little Osage forming the southern portion of the "V" and the Marais des Cygnes and the drainage ditch forming the northern portion of the "V". Along each branch of this V-shaped river pattern lies a broad flood plain relating to each of the streams. The land in this flood plain is extremely flat, there being an increase in elevation of approximately one foot per mile as one progresses upstream from Schell City through the flood plain to 71 Highway. The immediate concern will be with the river system of the Marmaton and Little Osage in the area between 71 Highway and their juncture with the Marais des Cygnes. This river system, viewed on the aerial photographs and topographic maps, can be described

only as serpentine. The plaintiffs' land is located immediately south of the Little Osage, immediately to the east of its confluence with the Marmaton. Various witnesses identify the river from that point to its joinder with the Marais des Cygnes as, alternatively, the Marmaton or Little Osage. For purposes of clarity, it shall be referred to as the Little Osage herein. The plaintiffs' land lying south of the Little Osage is an irregular-shaped tract by reason of the meanderings of the Little Osage River. The first loop or bend from the west to the east on the northern portion of the plaintiffs' property is referred to as Ghost Bend where the Little Osage makes a horseshoe bend running first northwest, thence northeast, thence southeast. Then, making a broad loop from that general southeasterly direction back to the east, thence northwest, it encompasses another large tract of land which is referred to as Tiger Bend, thence turning again northeasterly, flowing generally east and thence southeast, it encompasses another large area referred to as Pine Bend. At the northwest neck of the area referred to as Tiger Bend, the river has cut through a channel or cut-off which carries a portion of the river's flow directly into the river on Pine Bend without traversing the area around Tiger Bend. Thus, Tiger Bend, looping into the center of plaintiffs' land, is, in effect, an island.

The plaintiffs' lands, which total 1,840 acres, were acquired over a period of years by the acquisition of various tracts. Approximately 1,200 of the 1,840 acres were considered to be upland farm lands, and approximately 640 acres are considered to be bottom land. Substantial improvements have been made to the upland farm area, and the bottom land has been improved with fencing, partial clearing, and selective thinning of pecan trees which cover most of the areas referred to as Tiger Bend and Pine Bend and some portion of Ghost Bend. Prior to 1968, the areas which were bottom lands and pecan groves had been selectively thinned for the purpose of pro-

ducing an improvement in the pecan crop and to permit greater utilization of the native grasses which then grew in the bottom lands. Because the 185 acres of Tiger Bend was completely isolated by water, it was utilized as pasture by the plaintiffs; and access to it was afforded by two fords, one referred to as Slate Ford, and one referred to as Colin's Ford. In addition, plaintiffs have utilized Tiger Bend as a duck hunting area with particular emphasis on a slash or opening in Tiger Bend created for this purpose which had concrete duck blinds installed and a pump to maintain water in a low place at that point when it was not naturally flooded. It is conceded that all of the bottom land of the plaintiffs had been subject to overflow at various times as long as people could remember and that these overflows had occurred three to five times annually, depending upon the climatic conditions. As the river flows away from the eastern portion of the plaintiffs' property, it flows more generally north, but again in a series of serpentine bends. After it leaves the plaintiffs' property, there is a large tract of land comprising approximately 2,700 acres. This land is very generally flat, cleared, ditched and levied land. The levy which protects this land begins north of the western edge of plaintiffs' land, runs south to a point across from Ghost Bend, turns east and runs generally along the northerly side of plaintiffs' land to its eastern edge, then turns north and runs generally northerly along the large flat area referred to as the defendant's lands. This large flat flood plain within the levy was at one time known as the Dixon Meadows. Across the Little Osage which, as indicated, at that point is running generally north to northeast, lies another enormous flood plain known locally as the Crescent Meadows which has likewise been levied with the levy starting at the high ground on the east running west to one of the bends in the river, thence generally north to a point on the Little Osage some miles north of the plaintiffs'

land. The effect of these levees as they encircle the large flat areas of land is to creat a gigantic funnel with the spout of the funnel at the north and the flaring portion of the funnel extending southwest and southeast. At the time these levees were constructed beginning in 1960 and completed in 1968, there was simultaneous activity to deepen, straighten and clear the channel of the river at the point where the levees come together to form the "spout." Dixon Meadows was being operated at the time the levees were constructed by a Mr. Craigmiles. He described the levee system in detail and his work in clearing the channel and providing a rapid dispersal of the waters collected by the levee system. Essential to the operation of the lands on the west side of the river was the drainage system which had to go through the levee system and into the river to drain surface waters collected on the enormous areas enclosed within the levees. Mr. Craigmiles testifies that he had constructed two 48–inch gravity drain pipes and one 36–inch pressure pump pipe to accomplish this result. These pipes were placed so that the lowest pipe was approximately at the bottom of a natural water course, Crooked Creek. The second was placed slightly downstream but higher in the levee system, and the top pressure pump was again downstream but higher in the levee system as explained by Mr. Craigmiles. The two lower drain pipes operated on what he referred to as a gravity flow system. Each of them had a hinged trap door which permitted water seeking the river level from inside the levee to push up when water within the levee system was higher than the river water. When the level of the river water rose higher, the pressure in the river would shut the trap, and the flow from inside the levee system would be cut off, and, likewise, the river could not drain back behind the levee because of the trap. When the river level rose high enough to close both gravity traps, the 36–inch pump was then utilized to remove surface water from inside the levee and shoot it into the river.

This pumping system operated most efficiently when its outlet was not below the surface of the river, but it could be utilized, because of the force of the pump, even when the river was at flood stage. The land referred to as the Dixon Meadows was farmed at that time by Mr. Craigmiles and the land referred to as the Crescent Meadows was operated by a man named Richter. In 1968, Craigmiles sold the Dixon Meadows of 2,700 acres to the defendant, and shortly thereafter the defendant leased the Richter property, Crescent Meadows, on the east side of the Little Osage River. In order to operate these thousands of acres of bottom land, the defendant utilized large quantities of very heavy farm machinery and in order to facilitate the passage of this heavy equipment from the east, or Richter farm, to the west, or Craigmiles farm, the structure which gave rise to this litigation was built. The structure was built at the north end of the area where the channel had been straightened, widened and deepened at the spout of the funnel referred to, and it is approximately one mile as the crow flies from the northeast corner of plaintiffs' property. The manner of constructing the structure was to create a coffer dam upstream, a diversion ditch to turn the waters of the Little Osage aside, and then to excavate in the exposed river bed for footings for the structure. This excavation extended approximately fourteen feet below the then bottom of the Little Osage River. After the concrete footings were laid, two 16–inch walls were constructed of reinforced concrete. The upstream wall and the downstream wall extending laterally at right angles across the Little Osage were approximately 36 feet apart after these walls were constructed. Approximately in the center of the stream two 48–inch pipes were placed at or near the bottom level of the Little Osage River and immediately adjacent to each other. After the fill was placed on those two 48–inch tubes, two more 48–inch tubes were placed at a higher level in the structure. The four tubes formed a rough "W" in the structure.

After the two 48–inch tubes were placed, the remainder of the space within the 16–inch walls was filled with sand and rock and a one-foot thick concrete cap roadway was constructed from one bank to the other on top of the structure thus completed. A concrete apron was poured immediately downstream from the structure. Plaintiffs constantly referred to this structure as a dam, while defendant insisted it was a bridge. The top of this structure was approximately nine feet above the existing river bed although its footings extended below the bottom of the river by an additional 14 feet.

Approximately three weeks after the structure was completed, the plaintiffs complained to the defendant about the increased flooding of his lands and the fact that the water seemed to remain in the river channel at a higher level than it had been theretofore. Defendant's agents went to the plaintiffs' property and looked at the high water in the river and the areas where the plaintiffs claimed the grass had been destroyed. Several farmers in the area adjacent to the property farmed by the plaintiffs as well as the plaintiff himself testified that after the bridge was completed, the floods lasted longer than before and that as a consequence of the water remaining over the bottom lands for a longer period of time, native grasses which had existed theretofore in the bottom land had been killed and that great quantities of tall horse weed had replaced the native grasses. They likewise testified that the plaintiffs had lost hundreds of pecan trees as a consequence of the water remaining in flood stage around these trees and either causing them to topple over or to die as a consequence of the flooding situation. All of the testimony was to the effect that such conditions had never before occurred under the admitted flooding conditions which existed prior to the construction of the structure. The plaintiffs also claimed and offered evidence that access to Tiger Bend had been virtually impossible since the creation of the defendant's structure. This because the ford known as Slate Riffle which had previously afforded passage at times of low water now continually stood at depths of four to five feet and the ford referred to as Colin's Ford which had likewise afforded access through very low water now stood at a much greater depth making it impassable at all times. The plaintiffs also offered evidence that after the structure was completed, there was a very substantial log jam created upstream from the structure and that this log jam at times reached a height of eight or nine feet above the deck of the structure and extended upstream from a minimum of a hundred yards as stated by some witnesses to three or four hundred yards as indicated by other witnesses. The photographic evidence offered demonstrates that very substantial amounts of debris collected upstream and downstream from the structure. The photographic evidence likewise demonstrates beyond doubt that at some stages of river level the structure propelled the river's flow back and acted as a dam. One exhibit in particular indicating that water was flowing over the dam and cascading down to the apron on downstream side substantially raising the level of the water upstream as opposed to the water downstream. Defendant's evidence consisted of an attempt to demonstrate that major floods had occurred in the area in prior years, that the levees had constituted the major change in the water flowage in the area and that the structure created by the defendant made no difference in the flow of the stream or the level or duration of flooding over the plaintiffs' property.

As indicated, the case was tried to a jury which returned a verdict for plaintiffs for $28,750. The plaintiffs had originally pleaded a cause of action sounding in nuisance, but the case was submitted upon a negligence theory.

■ Turning to defendant's assertions of error, the first point is a general assertion of nonsubmissibility of the plaintiffs' case divided into three subparts. Preliminary to discussion of this point, it is to be

noted that defendant concedes the applicability of the rule that in reviewing an issue of submissibility after a jury verdict for the plaintiff, the plaintiff is entitled to have all the evidence favorable to the verdict considered as true and to all the favorable inferences to be drawn from the evidence. Defendant asserts that rule is modified by Begley v. Connor, 361 S.W.2d 836, 839 (Mo. 1962) to the extent that the rule does not require the court to accept as true that which under all the circumstances in evidence cannot be true, nor to give the plaintiff the benefit of any other than reasonable inferences.

The first subpart of defendant's claim that plaintiffs failed to make a submissible case requires a fuller statement for understanding. Extracted from the brief of defendant, the argument is as follows. Plaintiffs submitted on negligence, but claim permanent damages from completion of bridge to the end of time. They are, therefore, not concerned about anything after completion of construction, i. e., logs and debris accumulating. There is no evidence that the bridge was improperly designed or constructed. Therefore, plaintiffs failed to make a submissible case of negligence.

■ Assuming without so holding that the plaintiffs' instruction required evidence of improper design or construction, there is in this record sufficient evidence to submit that issue. Defendant in its brief asserts the evidence favorable to defendant on the issue of the effect of the structure on the river. This evidence was principally confined to evidence that the four "tubes" or "whistles" were of sufficient size to carry the "normal flow" during non-flood periods and the evidence that when the river was at "flood stage," the water was eighteen to twenty feet over the bridge which could, therefore, have no effect on the flow of water in the river or upon adjoining lands. This argument and the evidence supporting it proceed on an erroneous assumption that only the extremes of the river's flow are to be considered in determining the effect of the structure, vis-a-vis, the plaintiffs' land. There is a plethora of evidence that the bridge did, in fact, obstruct the flow of the river at *some* stages. One of plaintiffs' pictures shows a waterfall over the top of the bridge with the upstream water being at least five feet or six feet over the level of the downstream water level. There was evidence from witnesses that the water "backed" up to a depth of four or five feet over the normal level of plaintiffs' low water fords. That this could occur despite the difference in river bed elevations was admitted by defendant's hydrologist, who conceded the validity of a text on hydraulics which indicates that the less the slope of the river bed, the more pile-up or "head" is required to force the water to go over an obstruction. It is too plain for argument from the physical evidence that at some stages of river flow, both as the river rises and as it falls, the structure built by the defendant acts as a dam. When this occurs, water is backed upstream and its dispersal from the lands upstream is necessarily slackened.

Defendant, in support of this branch of its argument, cites Bunten v. The Chicago, R. I. & P. Ry. Co., 50 Mo.App. 414, 423 (1892). The first sentence of the quotation given, "The nuisance here, as originally erected, was not necessarily injurious . . . ", demonstrates the inapplicability of that authority.

What has been demonstrated here is that at some stages in the ebb and flow of the river, the bridge acts like a dam and impedes the flow of water entirely aside from the issue of the presence of debris. It is difficult to convey in language the impact of the photographic evidence demonstrating this point, but a description in physical dimension of the bridge will assist. The structure presents a solid concrete surface to the upstream flow approximately nine feet high and one hundred sixty feet across the stream excluding approaches. This sheer concrete wall of approximately 1,440 square feet had four 48-

inch circular openings, or a total of approximately 51 square feet of opening to permit the stream to flow through the bridge. This demonstrates the impounding effect of the structure at the river stages when the tubes could no longer carry the increased flow from above. Defendant asserts in its brief that the original level of the stream bed was 720 feet above mean sea level based on the deposition testimony of Craigmile. This testimony was with relation to the level of the lowest of the tubes built to permit escape of the water from the area behind the levees and the context indicates that the stream bed level he was referring to was the natural waterway referred to as Crooked Creek which Craigmile had utilized for the construction of the drain. Reference to all the geological survey maps in evidence (there were four) shows the stream bed elevation was 715 feet at Hightower Creek approximately a mile upstream, and downstream about five miles, the stream bed elevation was 710 feet.

The bed of the river at the site of the bridge was thus approximately 714 feet, while at Tiger Bend, it would have been approximately 716 feet. Thus, when water flowed over the bridge at an elevation of 723 feet, the upstream area at Tiger Bend would have to have a minimum depth of 6 or 7 feet of water which is consistent with the testimony offered by plaintiffs of water over their fords. The common-sense answer then to this portion of defendant's argument is that the bridge, in fact, obstructs the river, and such fact tends to show it was improperly constructed. It is not surprising that the authorities support such a common-sense view. The rule that evidence that such obstruction did result, tends to prove improper construction, is stated in 93 C.J.S. Waters § 20 at page 627. The supporting authorities are well reasoned and support the rule as stated.

A further and more basic flaw exists in the defendant's argument. De-

fendant seeks by a peculiar inversion to limit the consideration of the evidence of defendant's negligence to the act of constructing the bridge since the claim of damages was permanent. It is true that expressions may be found in the case law that assert generally that the permanency of the structure will generally affect the measure of damages to be applied. The rubric is generally stated that where the structure is permanent, the measure is the before and after value and where the structure is temporary, the plaintiff is limited to the damages accruing to the date of suit. This on the theory that plaintiff as a matter of policy should not be permitted to recover prospective damages which may never occur since the defendant, it is assumed, will not continue a temporary structure in the face of an adjudication that it is creating liability for damage. The rule and the underlying case law is discussed at length in Spain v. City of Cape Girardeau, 484 S.W.2d 498 (Mo.App. 1972). That case should not be read as establishing an absolute rule, for it is apparent that there is no logical or necessary connection between the type or nature of the structure and the type or nature of the injury or damage. An admittedly temporary structure such as a coffer dam or temporary scaffolding or piers in a natural water course may in the presence of a rise in the waters of a natural water course cause damage to upper riparian owners which could only be described as a permanent injury as, for instance, the washing away of the soil or permanent improvements on the land. Corrington v. Kalicak, 319 S.W.2d 888 (Mo.App.1959). Or, conversely, an admittedly permanent structure might, in the presence of a rise in the waters of a natural waterway, cause only transient·damage or injury dependent upon the season ·and the terrain affected. Hewitt v. Chicago, Burlington & Quincy Railroad Co., 426 S.W.2d 27, 32 (Mo.1968). In the latter case, the owner might be entitled to prospective damages in addition to those accrued, providing the proof was present that the damage was as certain to

recur as the rain was to fall and the water flows in the stream; and that measure would, of course, be the value of the land prior to the imposition of the hazard of such injury and its value with the hazard imposed. Hayes v. St. Louis and San Francisco Ry., 177 Mo.App. 201, 162 S.W. 266, 269 (1913).

It is, likewise, true that in cases involving a natural stream or water course that the accumulation of drift arising from the natural flow of the stream and which, upon its accumulation, causes the water to flow upon and damage a riparian owner constitutes the basis for a recovery for the damage caused. Hewitt, supra, 426 S.W.2d l. c. 32.

 In short, the issue of the submissibility of the negligence issue in no wise depends upon the nature of the injury caused, but depends on the evidence offered tending to bring the case within the rule universally accepted that "any obstruction of the flow of water in a natural water course, resulting in injury to another person, furnishes such person a right of action, however careful the obstruction may have been made." Webb v. Carter, 121 Mo.App. 147, 154, 98 S.W. 776, 778 (1906); Keener v. Sharp, 341 Mo. 1192, 111 S.W.2d 118 (1937); Corrington v. Kalicak, 319 S.W.2d 888 (Mo.App.1959); Jacobs v. Frangos, 329 S.W.2d 262 (Mo.App.1959); Happy v. Kenton, 362 Mo. 1156, 247 S.W.2d 698 (1952); Beauchamp v. Taylor, 132 Mo. App. 92, 111 S.W. 609 (1908); Schalk v. Inter-River Drainage Dist., 226 S.W. 277, 278 (Mo.App.1921).

Defendant likewise claims that the evidence fails to make a submissible case on the issue of proximate cause. This point, if it be a point, is supported in defendant's brief by a prolix argument on what the evidence was in the case. That argument is based almost entirely on excerpting evidence favorable to the defendant and asserting that that evidence plus the inferences favorable to the defendant show that plaintiffs' evidence is unworthy of belief.

It would be a sufficient answer to simply restate the rule of review adverted to before, but the argument is so persistently made that further analysis will be helpful.

Without detailing the evidence defendant has extracted to support it, the argument reduced to its essentials is as follows. The effect of the bridge on upstream flooding is extremely complex and beyond the capacity of lay witnesses or the jury to comprehend. Portions of the testimony show that when the water is still over the bridge, the flood waters have receded from plaintiffs' lands. This testimony referring specifically to the December, 1971 flood was to the effect that the river was out of its banks for a long period of time and that there was not enough rain to cause it to leave its banks or remain out that long. Defendant then asserts that the photographic evidence demonstrates conclusively that this was a major flood and would have been so regardless of the bridge's presence. This the defendant says demonstrates that it is not the bridge which floods the plaintiffs' lands, but the higher water stages downstream at the confluence of the Little Osage and the Osage at Schell City which backs the water upstream and causes the floods. The inconsistency of defendant's argument is apparent. On the one hand, defendant argues the high water stage at Schell City backs water 20 miles upstream to flood plaintiffs; but the bridge, a 9-foot obstruction two miles downstream, has no effect on the flow of waters on plaintiffs' lands.

More significantly, the graphs presented by defendant of the river stages in the December, 1971 flood show the factual inconsistency of defendant's position. Those graphs show that the rivers crested December 17 on the Marmaton at Nevada at 750 feet and on the Little Osage at Horton at about 745 feet. The crest at Schell City downstream occurred two days later at 730 feet. Thus, the facts demonstrate that the high water at Schell City two days later did not have the effect of causing the

crests two days earlier upstream from the plaintiffs' property.

In fact, when properly analyzed, the defendant's exhibits and expert testimony do not support logically the defendant's assertion that plaintiffs' evidence is not worthy of belief in the light of the exception stated in Begley, supra. The defendant offered the testimony of a retired government hydrologist. Defendant offered six detailed graphs and a map in connection with the hydrologist's testimony. Four of the graphs delineated river stage readings taken in various months in 1961, 1965 and 1967–71. The readings were taken by river gauges located near Nevada, Missouri on the Marmaton River, Horton, Missouri on the Little Osage River, Schell City, Missouri on the Osage River. Schell City is 22 river miles below Horton. It is also below the confluence of the Little Osage River, Osage River and the Marais des Cygnes drainage ditch.

The defense made a concerted effort to show that the height and duration of river stage readings taken at Schell City correlated directly with the height and duration of high river stages on the land in question. According to defendant's thesis, the flooding of plaintiffs' lands resulted from the high water recorded at Schell City. Allegedly, high water at Schell City superseded the flow of the Little Osage causing those waters to back up so as to flood plaintiffs' property for a time period equal to the duration of high water at Schell City. It is apparent from an examination of defendant's graphs that the river stages at Horton and Nevada and the duration of those stages does not bear a direct and exact relationship to the height and duration of the river stages recorded at Schell City for corresponding dates. For a period in October, 1971, the river stage at Horton, three miles above plaintiffs' farm, increased, while for the same period, the river stage at Schell City decreased. From May 20–22, 1971, the river level at Nevada and Horton increased, while the river level at Schell City decreased. The reverse is also demonstrated by the charts. For the period of June 28 to July 1, 1969, a marked decrease in the water level at Horton occurred, while there was a steady increase in the water level at Schell City. The same is also true to a marked extent in October, 1961. Thus, the premise of defendant's argument that there is a corresponding relationship in the level and duration of river stages at Schell City and of river stages near the property in question fails in the face of the river stage graphs recorded above and below plaintiffs' property and the C. B. K. structure for corresponding time periods.

In addition, to properly evaluate the defendants' claim that the evidence does not support the proximate causation of plaintiffs' damage, the nature and extent of plaintiffs' claimed damage must be considered. Plaintiffs asserted damages for killing of grasses by being submerged *too long,* loss of pecan trees by inundation for *too long* a period, deposit of debris on plaintiffs' lands, and fences because the ebb of flood was *slower* and a lengthening of the periods of time when the fords to Tiger Bend were impassable because of high water. Thus, the entire thrust of plaintiffs' claims as to damages turned on the issue of the slowness of dispersal of the waters, not on the presence of the high water. Viewed in that perspective and based upon eye witnesses who testified to the *fact* of the longer periods of flooding and the testimony of Craigmiles who succinctly termed the bridge a stopper in the funnel formed by the dikes, the plaintiffs sustained their burden of showing the proximate cause of the damage. The evidence of such eye witnesses to the length of flooding is admissible. Owen v. Chicago, R. I. & P. Ry. Co., 109 Mo.App. 608, 612, 83 S.W. 92, 93 (1904).

Defendant cites Evans v. Massman Const. Co., 343 Mo. 632, 122 S.W.2d 924 (1938); Kinealy v. Southwestern Bell Telephone Company, 368 S.W.2d 400 (Mo. 1963); and Atchison, Topeka & Santa Fe Ry. Co. v. Hamilton Bros., Inc., 192 F.2d

817 (8 Cir. 1951), in support of its factual argument. If the factual argument were sound, there would be some basis for such cases being cited in support. Under the evidence in this case, they are not persuasive. Massman, supra, had virtually no evidence to indicate that the construction of the dike in question diverting the Missouri River upstream nearly three miles would have been the cause of plaintiffs' damage in the light of the fact that there were sixteen other dikes between the dike in question and the levee break upstream and that all of these dikes had the same properties with respect to the effect of impeding the flow of the river as the dike in question. Kinealy, supra, a landslide case, is one where the plaintiff relied on testimony by an expert for the causative connection and the expert declined to testify on the issue of causation since the factual basis for such expert testimony was not in the record. The Federal case cited rests on the fact that the well defined and measured levels of the stream in question showed indisputably that the causative factor of the flooding was a blockage in the river *upstream* from the defendant's bridge.

Upon factual background and evidence markedly similar to those in the instant case, courts have ruled that the issue of proximate cause was submissible to the jury. Happy v. Kenton, 362 Mo. 1156, 247 S.W.2d 698, 706 (Mo.1952); Smithpeter v. Wabash R. Co., 360 Mo. 835, 231 S.W.2d 135 (1950); Edwards v. Missouri, K. & E. Ry. Co., 97 Mo.App. 108, 71 S.W. 366 (1902); Hoelscher v. Missouri, K. & T. Ry. Co., 182 S.W. 1078 (Mo.App.1916); Kennedy v. Union Electric, 358 Mo. 504, 216 S.W.2d 756, 761 (1948); Hewitt v. Chicago, Burlington & Quincy Railroad Co., 426 S.W.2d 27, 32 (Mo.1968).

■ Defendant's second assertion is that the court erred in permitting the plaintiffs to change their theory of recovery from intentional temporary nuisance to negligence and permanent damages. Defendant claims this was surprise and prejudiced the defense. Defendant cites Lorraine v. E.

M. Harris Building Company, 391 S.W.2d 939, 942 (Mo.App.1965); Faught v. St. Louis-San Francisco Railway Co., 325 S. W.2d 776, 781 (Mo.1959); Schimmel Fur Co. v. American Indemnity Co., 440 S.W. 2d 932, 939 (Mo.1969), and Martin v. Yeoham, 419 S.W.2d 937, 944 (Mo.App.1967), saying these cases hold that to permit a party to plead one set of facts and another theory to the unprepared surprise of the defense is prejudicial error. No detailed analysis of these cases is required. Lorraine, supra, and Martin, supra, were cases where no attempt was made to amend the pleadings which would have made the cases submissible. Schimmel Fur Co., supra, was a case where the defendant sought to impose affirmative defenses not pleaded, and Faught, supra, involved a failure on the part of plaintiff to allege the date of the accident with particularity and the court held there was no prejudice to the defendant. None of these cases dealt with a case like this where there was a motion sustained under Rule 55.54, V.A.M.R. to amend the pleadings after verdict. It is settled that when the trial court has acted to permit an amendment under Rule 55.54, the issue becomes one of a question of an abuse of discretion. Middleman v. Complete Auto Transit, Inc., 486 S.W.2d 456 (Mo.1972); Condos v. Associated Transports, Inc., 453 S.W.2d 682 (Mo. App.1970); Eckhardt v. Bock, 159 S.W.2d 395 (Mo.App.1942).

Defendant's point as stated does not raise the issue of an abuse of discretion, but the factual argument made suggests that this is the real basis for defendant's complaint in this regard. Considering it as such, it must still fail. The claim that defendant was prevented by the trial court from offering evidence of the proposed height of the waters impounded by the Kaysinger Dam because of the theory of plaintiffs' case at the time the trial court ruled the evidence inadmissible is not supported by the record. The defendant was arguing that it should be permitted to show that its agents and servants investigated

and determined the critical level of the Kaysinger inpoundment before constructing the bridge. The theory of this defense testimony was apparently that proof of these facts would show that any damage caused by defendant's structure merely anticipated the ultimate inundation of plaintiffs' lands or, alternatively, as plaintiffs' counsel assumed in the colloquy on this point, that plaintiffs would be compensated by condemnation damages from the Federal government when their lands were taken by the Kaysinger project. Much argument by counsel ensued as to the present status of any attempt to condemn plaintiffs' lands and as to the effect of Kaysinger Dam on plaintiffs' lands. Argument it was; proof it was not. When the court specifically inquired of defendant's counsel if he were prepared to offer proof of the status of the Kaysinger project, he stated he was not; and the court excluded the evidence.

■ The ruling was unquestionably correct on the basis of the record made, but it would have been proper to exclude such evidence even if the proper proof had been offered. This because plaintiffs were asserting that permanent diminution in value arose when the structure was built, and its influence on the flowage of the river killed native grasses and pecan trees and impaired access to Tiger Bend. That damage having occurred prior to any taking for Kaysinger would be reflected in the damages for any such taking for such purpose if and when a taking occurs. In short, such evidence would be immaterial on whatever theory of recovery plaintiff proceeded and its proper exclusion by the trial court could not afford a basis for an abuse of discretion.

Defendant also claims that it was prevented from offering evidence of the contributory negligence of plaintiffs by allowing debris from logging operations and the growth of willows to impede the flow of the river. Here again, there was no attempt to offer such evidence by independent proof, and it appears to be an afterthought. The defendant knew as the case

progressed that the evidence was coming in on a theory of negligence. This is indisputable since defendant in its motion for a directed verdict at the close of plaintiffs' case and at the close of all the evidence asserted there was no proof of defendant's negligence. Defendant offered evidence to show the structure was carefully planned and built and defendant, in cross examination of both plaintiff and plaintiffs' witnesses, attempted to show that a logging operation on Tiger Bend had left trees and brush in the area which would float down and block the channel. The defendant did not assert surprise at the time plaintiffs' instructions were offered; but, in view of the defendant's now-asserted claim that the plaintiffs' submission was a "surprise," it would seem strange that no objection was raised to submitting on a theory of negligence. Nor does the record reflect that defendant offered any instructions on a different theory.

■ Under the same claim of surprise, defendant asserts that plaintiffs were permitted by this change in theory to interject issues of damages accruing after May, 1970, and to claim permanent and future damages as in a condemnation suit. On the first point, plaintiffs point out that defendant has misconstrued the petition, that the reference in the petition to May, 1970 in the original petition was an allegation relating to the time when defendant conveyed the land, and was not intended to limit the damages claimed to any such period. As to the latter portion of the argument, enough has been said to show that the plaintiffs' theory was that the construction and continued presence of the structure caused such differences in the flow of the river as to cause plaintiffs' lands to receive permanent damages. The defendant was well aware of plaintiffs' theory as to damages—a pretrial request for continuance indicated defendant was meeting the issue of before and after value and the plaintiffs, in pretrial proceedings, repeatedly indicated that was to be the theory of damages. In fact, defendant itself

offered expert testimony of the issue of value before and after. No abuse of discretion being shown, there was no error in permitting the amendment.

The defendant, in its third point, asserts error in the giving of the principal instruction, this allegation of error being divided into seven specific subpoints. An amalgamation of some of these points may be made as they are, in effect, a further explication of the defendant's continued assertion that the case was submitted on the wrong theory and was, in fact, a nuisance case. For clarity, these assertions will be paraphrased in logical relationship to that central argument. So stated, the defendant claims that the instruction is erroneous because it is contrary to the theory and philosophy of MAI, there was an applicable MAI instruction, MAI No. 22.06, that the instruction given is contrary to the pleadings, proof and theory at trial, that the instruction given is not supported by the evidence and fails to require a finding that the use of the defendant's land was unreasonable or that the structure was permanent. What has been said heretofore with respect to the claim of the defendant that the court erred in permitting the plaintiffs to change their theory of liability and damages has application here as well, for once that point has been decided adversely to the defendant, little remains of its validity as a complaint against the instruction given. It has been clearly stated heretofore that the plaintiffs did make a submissible case under the evidence and that the pleadings were amended after judgment to conform to that theory of recovery, and it is equally clear that such a negligence theory is permissible where the plaintiff claims injury from the obstruction of a natural water course. Corrington v. Kalicak, 319 S.W.2d 888, 892; Happy v. Kenton, supra; Kennedy v. Union Electric, supra.

As to the first of the points mentioned above, the argument portion of the brief makes no effort to support the claim that it is contrary to the theory and philosophy of the instructions unless it be with reference to Rule 70.01(b) and (c) and Brown v. St. Louis Public Service Company, 421 S.W.2d 255 (Mo. banc 1967), which relate that point to the claim that instruction 22.-06 was the appropriate instruction in this case. As has already been stated repetitively, this ignores the fact that the plaintiff chose to submit on a negligence theory and the case was so submitted. The point that the instruction given is contrary to the pleadings, proof and theory at trial and is not supported by the evidence fails for the same reason.

The argument that the instruction should have contained a finding that the use of the defendant's land was unreasonable or that the structure was permanent is based on the defendant's assumption stated as follows: "Regardless of whether the construction and maintenance of the bridge was intentional or negligent, there is no question but what we are dealing with here is a nuisance situation—if anything and that is all that has been pled. Whether or not the nuisance is an intentional one or a negligent one the jury must still make a determination as to whether or not the use of defendant's land is reasonable in view of the possible direct and indirect effects such use might have on the use of plaintiffs' land."

This argument by the defendant again ignores the entire course of the trial and the theory upon which plaintiffs submitted their cause, as well as the amendment of the pleadings permitted by the trial court after judgment in accordance with Rule 55.54. What the defendant argues would be true if, in fact, this cause had been submitted on a nuisance theory, but it simply has no application to the cause as submitted and as it exists before this court. With respect to the claim that the instruction should have specifically found that the structure was a permanent obstruction, the defendant has cited cases which deal with abatable nuisances. The argument to support the contention that the instruction should have required a finding that the structure was permanent

proceeds on the same basis as the other complaints with respect to the instruction. It assumes that the claim was for nuisance. The argument made by the defendant fails for another reason on this branch of the case because the defendant persists in arguing that the type of damages claimed determines the issue of whether or not a requirement of permanency of the obstruction is required. It has been stated as a general rule in nuisance cases that where the structure is permanent that the plaintiff is then entitled to recover permanent damages and that where the nuisance is temporary or abatable, the measure of damages is not the diminution in value but the damages accruing prior to the suit. This on the policy basis that in a case of a temporary nuisance, the plaintiff should not be permitted to recover future damages that may never be sustained since the defendant should not be required to pay future damages on the theory that he will continue to illegally inflict injury upon the plaintiff. Shelley v. Ozark Pipe Line Corporation, 327 Mo. 238, 37 S.W.2d 518 (1931); Spain v. City of Cape Girardeau, 484 S.W.2d 498, 505 (Mo.App.1972). The rule thus broadly stated does not cover all the possibilities even in an action for nuisance as is pointed out in Spain, supra, there are nuisance cases in which all the damages are at once produced by the act or condition. In such cases, the plaintiff is entitled to recover for the permanent damages. It is clear under the evidence in this case that the exception to the rule prevails; and for this reason, the argument made by the defendant must be rejected. The issue of the permanency of the structure was simply not in this case, for the plaintiffs' damages to the grass which were claimed to be permanent, to the standing trees which were killed and the loss of accessability to Tiger Bend were all of a permanent nature under the evidence, and the removal of the bridge would not have made the plaintiffs whole. Thus, the cases cited by the defendant with respect to the submission of permanency are not in point and do not support its position.

One other point requires some further discussion. As a part of its claim of error with respect to the principal instruction, the defendant claims that it fails to require a finding that the defendant knew or should have known that such use would cause any damage to plaintiffs. Again adverting to the defendant's theory that the case sounded in nuisance, the defendant argues that the plaintiffs, having chosen to submit the case upon whether or not the nuisance was negligently created, the propriety of the instruction is to be judged by what is a proper negligence submission. The case was not submitted on a nuisance theory, and the plaintiffs are not to be held to a theory of nuisance in justifying the instruction. Nonetheless, the defendant has cited Ferguson v. Union Electric Company of Missouri, 282 S.W.2d 505, 509 (Mo.1955), for the proposition as stated in defendant's brief, " . . . the court held that the plaintiff, having elected to submit the nuisance on a negligence theory must submit and require the jury to find that the defendant knew or should have known . . . would have caused . . . damage to plaintiffs' property." The Ferguson case does not involve a submission under nuisance, and to that extent, the defendant's claim that it was a submission of nuisance on a negligence theory is in error, but the defendant is correct that under a negligence theory, the Ferguson case holds that a required finding is that the defendant knew or should have known of the possibility of damage to the plaintiffs. The difficulty with this argument from the standpoint of providing a basis for error in the giving of the plaintiffs' principal instruction is that the defendant's motion for a new trial did not make that assertion of error. Rules 70.02, 79.03, 84.13 limit appellate review to those points presented to the trial court in a motion for new trial or "expressly decided by the trial court." This was not presented to the trial court in the defendant's motion for a new trial, and it cannot be reviewed by this court. Bower v. Hog Builders, Inc., 461 S.W.2d 784 (Mo.1970). State ex rel. State

Highway Commission v. Heim, 483 S.W.2d 410 (Mo.App.1972); Stafford v. Far-Go Van Lines, Inc., 485 S.W.2d 481 (Mo.App. 1972).

■ Defendant asserts finally under this point that the instruction is misleading and prejudicial because of the language, "such use by defendant of its property was negligent." Examining the instruction as a whole, the word "use" could only refer to the preceding paragraph in which the plaintiffs hypothesized a construction of the bridge across the river which obstructed the river and backed water upstream and does not, as defendant suggests, permit the jury to consider the construction of levees as a cause of the plaintiffs' damage. It may, as defendant suggests, have permitted the jury to consider a failure to maintain the bridge and keep the river free of debris, but it is clear that a bridge which is constructed in such a fashion that it accumulates drift and thereby acts as a dam affords a basis for recovery by riparian owners who are damaged. Edwards v. Missouri, K. & E. Ry. Co., 97 Mo.App. 103, 71 S.W. 366 (1902); Hoelscher v. Missouri, K. & T. Ry. Co., 182 S.W. 1078 (Mo.App.1916); Corrington v. Kalicak, supra; Smithpeter v. Wabash R. R. Co., 231 S.W.2d 135; and it is equally clear that the evidence in this case supports a finding that the structure as built and used by the defendant would so block the stream and cause the accumulation of substantial amounts of debris which slowed the flow of the stream.

The instruction which has been here discussed has not been set out in full since it is far from a model to be used in the submission of a flood damage cause on a theory of negligence but, tested against the claims of error asserted by the defendant, it did not constitute a misdirection of the jury and will not afford a basis for reversal of the jury's verdict.

Defendant's further point of alleged error is in giving of instruction number 4 which is as follows:

"INSTRUCTION NO. 4

If you find the issues in favor of the plaintiffs, then you must award the plaintiffs such sum as you may find from the evidence to be the difference between the fair market value of the plaintiffs' farm property before it was damaged and its fair market value after it was damaged."

■ The defendant reiterates under this point that the instruction is contrary to the plaintiffs' petition which sought to recover temporary damages up to May of 1970, that there was no evidence that the bridge was permanent or that plaintiffs' injuries were permanent, that it fails to advise the jury that it would award either permanent or temporary partial damages, or that the plaintiffs would sustain damages as a result of defendant's acts or omissions.

This already long opinion will not be further burdened by repeating what has heretofore been stated or belaboring the obvious. The cases cited by defendant in support of the claim of error are Schimmel, Lorraine & Faught, as well as cases referring to temporary nuisances. These cases have no application in the setting of this case and do not compel a finding that the instruction was error. The argument with respect to permanence has no more application here than it had with respect to the principal instruction. The case was submitted as a negligence case, and cases involving nuisance are not in point. The pre-trial preparation, the evidence in the case and the plaintiffs' obvious theory as shown by those pre-trial proceedings and the evidence offered make it clear that the damages sought in this case were major, permanent damages to real estate. It is sufficient to cite Belveal v. H. B. C. Development Company, 279 S.W.2d 545, 554 (Mo.App.1955):

"In actions for injuries to real property by the obstruction of a natural watercourse, or by the diversion, accumulation

or discharge of surface waters, the measure of damages is the same as in other cases of injuries to such property. 56 Am.Jur., Waters, Sec. 40, p. 526, Sec. 87, p. 571. 'When the damage to real estate is permanent and the injuries of a major character, the proper measure of damages is the difference between the market value of the (property) immediately before and after the injuries occurred and there must be evidence of such values.' "

The defendant, as a final claim of error with respect to this instruction, claims that the instruction does not advise the jury how damages should be apportioned among the various causes of flooding mentioned in evidence. The claim is that there were *two* or more causes of plaintiffs' damage and the jury was not properly instructed so as to isolate the damages from each.

■ Defendant cites Vest v. City National Bank and Trust Company, 470 S.W. 2d 518 (Mo.1971) and Miller v. American Insurance Company, 439 S.W.2d 238 (Mo. App.1969), which hold that the use of the word "occurrence" in MAI 4.01 is error where there are two occurrences for one of which the defendant would be liable and for one of which no liability attaches. The instruction given in the instant case is MAI 4.02 which does not use the word occurrence. No doubt, the Committee in the preparation of the MAI instructions did not envision the use of this instruction in a case like the present one since a reading of the comments indicates that its intended use was for negligent injury to chattels. The fact remains, however, that this instruction, MAI 4.02, is the only instruction which states the rule for permanent damage to real property under the existing case law. Belveal, supra. Its use by the plaintiff is understandable in view of the admonition of Rule 70.01(b) that where an MAI instruction is applicable, it shall be given to the exclusion of all others. What has been said thus far is not intended as an expression of approval of the use of MAI 4.02 in any negligence case where an

issue of multiple causation, in fact, exists. It would appear that in such cases MAI 4.-02 should be so modified as to require the jury by its findings to separate or apportion the damages directly resulting from the negligence of the defendant. In a permanent nuisance type of submission, it is clear that the use of MAI 4.02 has been approved. Bower v. Hog Builders, supra.

■ Nonetheless, before reversible error could be predicated upon the giving of MAI 4.02 in the instant case, the defendant need show that it was a misdirection under all the *evidence and the other instructions*. It is settled that in considering the question of a misdirection or of nondirection the instructions are to be read together. Jefferson v. Biggar, 416 S.W.2d 933, 939 (Mo.1967). Miller v. Ransom and Company, 407 S.W.2d 48, 54 (Mo.App. 1966).

■ Plaintiffs' principal instruction required the jury to find that defendant's structure obstructed the river and backed water upstream *and* substantially impairs plaintiffs' use of its property that such conduct by defendant was negligent and that as "a direct result of such negligence, plaintiffs sustained damage." Reading this instruction 4.02, which, in pertinent part, referring to before the damage . . . and after it was damaged, could not have been understood as directing them to consider any damage except that which was a direct result of defendant's negligence which they had been required to find as being the impairment of plaintiffs' use of the land caused by the obstruction of the river by defendant's structure.

What has been said thus far assumes evidence was present in the record from which the jury could find that the damages plaintiffs claimed *resulted* from another cause. Defendant states, by way of argument, in the brief that the instruction permits the jury "to charge the defendant with all damages plaintiffs may have sustained from whatever source—natural and normal flooding, excessively large floods,

back-up water from the Marais des Cygnes drainage ditch, the Richter Levee, the first Craigmiles levee, the second Craigmiles levee or plaintiffs' willow infested river bank, . . ."

It was conceded by plaintiffs that flooding of plaintiffs' lands was usual and occurred several times annually. But plaintiffs' evidence also was that such recurring floods had never before caused the damages now complained of which were by the evidence directly attributed to the delay in the dispersal of the waters from the lands of the plaintiffs when the usual floods occurred. The defendant assumes that damage would have occurred from the normal flooding regardless of the presence of the structure. It is apparent that a flood would cause some *"damage"* and common sense would require such an assumption if plaintiffs' claim were for the ordinary type of damage involved in floods over farm lands such as the loss of crops or damage to buildings. Plaintiffs' evidence on the *causative factor* of the *damages claimed*, however, was narrowly confined to the *cause* mentioned. The evidence was that the native grass died because of the *length* of time the water covered it. The tree loss was also attributed to the *length* of time the root system was flooded. The damages to fencing was directly attributed to the effect of the bridge "pooling" the water and permitting the debris to spread out contrary to the usual course of the "logs going to the center of the current." The interference with access to Tiger Bend was directly related to the structure itself. The plaintiffs were not seeking to claim lack of access during floods—it was before and after the floods that such access was denied.

There is testimony which indicates there may have been an effect on flooding conditions by reason of the building of the levees. It is meager and not conclusive; but above that, it does not relate that effect, if such there was, to the damages claimed by plaintiffs.

The instant case is not like Jurgeson v. Romine, 442 S.W.2d 176 (Mo.App.1969) or Somerset Villa v. City of Lee's Summit, supra, where the evidence showed specifically the various causes of the whole damages. This case comes within the logic of Kennedy v. Union Electric Co., 358 Mo. 504, 216 S.W.2d 756 (1948), which holds that where the flood would not have occurred but for the obstruction, the defendant is liable. Here, the flood might have occurred, but under plaintiffs' theory and evidence but for the obstruction, the damages claimed would not have ensued.

Defendant seeks reversal of the judgment in a separate point listing seven separate areas of evidence which the defendant claims the trial court improperly excluded.

At the pre-trial conference, plaintiffs raised the question of the admissability in evidence of the purchase prices of the plaintiffs' land. Plaintiffs asserted the land was acquired in a series of purchases beginning as early as 1954 and extending over a period of years ending in 1965. They further asserted that there had been major changes and improvements to the land and that there had been enormous increases in the price of farm land over the period of years that the tract was assembled. The plaintiffs called the trial court's attention to Kirst v. Clarkson Construction Co., 395 S.W.2d 487, 498 (Mo.App.1965), for the proposition that the admission of such evidence is within the discretion of the trial judge. It was also pointed out that there were "trades" involved in the acquisition of some of the land, and this fact alone might be sufficient to sustain the exercise of the court's discretion in the denial of the admission of this evidence. The evidence in the record, in any event, demonstrates that very substantial changes had been made in the real estate since its acquisition by the plaintiffs, the renovation of improvements, the building of 8½ miles of fencing, construction of several farm ponds, the improvement of pastures by bringing the land to appropriate soil test

levels are all indicative of change in the land sufficient to bring it within the exception to the rule permitting proof of purchase price. Likewise, the defendant's brief itself shows that the first of the land purchased in 1955 was purchased for $25 an acre whereas the last land was purchased in 1965 for $400 per acre, which is cogent evidence, if any were needed, that the value of farm land has increased very markedly since the acquisition of these lands by the plaintiffs and that since increase in value arising from conditions totally unrelated to the issues in this case is persuasive in supporting the discretion of the trial court in refusing the admission of the purchase price. Esmar v. Zurich Insurance Co., 485 S.W.2d 417 (Mo.1972) is a case where such a change in economic situation was specifically recognized.

■ On the basis of remoteness in time, substantial changes in value, the addition of substantial improvements by the plaintiffs and the fact that a portion of the sales involved trades affecting sales prices, the trial court did not abuse its discretion in the exclusion of this evidence.

■ Defendant also objected to the trial court's exclusion of the testimony of defendant's expert witness on real estate values as to the profits from the lands as shown by the income tax returns of the plaintiffs or upon the expert's assertion of anticipated earnings to be expected under average management. Defendant argues that it was peculiarly appropriate to permit loss of earnings evidence because, as defendant again asserts, the theory of temporary nuisance applies. Defendant cites Bollinger v. American Asphalt Roof Corporation, 224 Mo.App. 98, 19 S.W.2d 544 (1929), in support of this proposition. Enough has been said about the theory upon which the case was tried and submitted to demonstrate the fallacy of this argument. The tax returns of the plaintiffs, when excluded by the court, do not create reversible error where the issue is the value of the land before and after. Bower v. Hog Builders, 461 S.W.2d 784 (Mo.1970).

■ Defendant also contends that the court erred in refusing to permit the defendant to introduce evidence of the dismissal of the injunction suit to which the plaintiffs were originally parties. Defendant cites Bledsoe v. Northside Supply and Development Co., 429 S.W.2d 727 (Mo. 1968) for the proposition that an abandoned pleading is admissable as an admission against interest. The point is not developed beyond that simple assertion in the brief of defendant. It is not clear from the pre-trial conference at which the issue was raised as to which portion of the pleading in the injunction suit was to be offered, but the defendant asserted that it was offered to show that the plaintiffs were not damaged since they could have pursued their injunctive remedy and abated the bridge, thereby concluding any damage. This argument again proceeds on the erroneous basis that the plaintiffs' claim for permanent damage rested upon the continual and continued flooding of their lands, while the plaintiffs' proof was that the permanent damage accrued shortly after the erection of the structure and no abatement could have restored the plaintiffs' land to its original condition. Plaintiffs' counsel properly pointed out that in any event the pleadings' legal conclusions were not admissable as admissions against interest, and only the statements of fact against the interest of the pleading party were in any wise admissable. Hall v. Denver-Chicago International, Inc., 481 S.W.2d 622, 628 (Mo.App.1972). The question of whether admissions of fact in an entirely separate suit against a different defendant but involving somewhat the same subject matter are admissable within the rule defendant claims applies need not be reached or decided in this opinion. The point is overruled.

Defendant also reiterates its claim that the projected flooding limits of the Kay-

singer Dam should have been permitted in evidence. The argument of the defendant as to the exclusion of this evidence is repetitive of the argument made heretofore in connection with defendant's claim respecting the change in theory by the plaintiffs and what has heretofore been said with respect to the admissability of the evidence applies insofar as the claim of error is asserted. It was properly excluded.

■ Finally, the defendant complains of error in excluding the testimony of the witness, John Sheer, the precise offer being that this witness, Sheer, would testify that in the presence of one of the plaintiffs, another person named Edmonds had made an assertion that Edmonds had not experienced any greater flooding or damage after the erection of the structure and that the plaintiff failed to deny this. The mere statement of the offer demonstrates the hearsay character of the evidence offered, and defendant's half-hearted assertion that it constitutes an admission by silence does not convict the trial court of error in this respect. In Creager v. Chilson, 453 S.W.2d 941 (Mo.1970), an almost identical situation prevailed. In that case, a witness was asked to testify as to what another person said about an accident in the presence of the defendant who did not deny the statement. The court first held the record did not support a finding that the defendant had, in fact, made the statement. On the basis of its admissability as a tacit admission, the court pointed out specifically that before any such tacit admission by silence is admissible in evidence, there must be a showing that the defendant was under a duty to speak in the circumstances. There was certainly nothing in this record that indicated that the plaintiff was under any legal duty or even any social obligation to respond to the assertion made by one of the parties to the conversation. Such evidence is, in the language of the Creager case citing from 29 Am.Jur.2d, Evidence Section 633 (1967), dangerous and to be received with caution.

There is no error in the refusal of this evidence by the trial court.

■ The defendant likewise asserts error on the part of the trial court in the admission of certain evidence offered by the plaintiffs. There are three separate claims under this point. First, defendant complains that the court erred in permitting the plaintiffs to prove as a comparable sale in connection with an expert's testimony the purchase price the defendant paid for its land from Craigmiles in late 1967. The question of similarity of properties for the question of showing the value of real estate and admitting evidence of comparable sales is a matter within the discretion of the trial court. State ex rel. State Highway Commission v. Sams, 484 S.W.2d 276 (Mo.1972), a condemnation case involving 28 acres in Cass County, held that "the admission into evidence of comparable land sales 'was made in the reasonable discretion of the trial judge, and no abuse of discretion is indicated.'" Appellant's claim of error in permitting evidence of sales of lots located in platted and partially developed areas near the unimproved property was rejected.

The Missouri Supreme Court again upheld the standard of discretion of the trial judge on this evidentiary point in State ex rel. State Highway Commission v. Twin Lakes Golf Club, Inc., 470 S.W.2d 313 (Mo.1971). The property there in question was 3.7 acres in Saint Louis, which had water and electric utilities, but no sewer hook-ups and an estimated worth of between $39,000 and $85,000. Appellants complained about the admission of the sale prices of lots 1/4 mile from the land in question, that had sewers available and ranged in size from one to two acres and ranged in price from $11,500 to $14,000. The court ruled that the ". . . importance of evidence of the sale price of other land depends upon the degree of nearness of sale in point of time and the proximity of the property, of the similarity in location, and in the use to which the property

may be adaptable. In determining the admissability of evidence of this nature there necessarily must be considerable discretion on the part of the trial judge." Since it is almost impossible to find property which is exactly similar and which has been recently sold to the property in question in any given case, the court in St. ex rel. State Highway Comm. v. Twin Lakes Golf Club, Inc., supra, ruled that "if the trial court, in its discretion, determines that the property involved in the sale is sufficiently similar, . . . it should be admitted and the dissimilarities considered by the jury in determining the weight to be given the evidence."

Defendant cites State Highway Commission v. Henderson, 381 S.W.2d 10 (Mo. App.1964), for the proposition that the improved condition of the C. B. K. property makes the sale price of it to C. B. K. from Craigmiles unworthy as a standard by which to judge the value of plaintiffs' property. However, the Henderson case stands for the proposition that, in determining the validity of the original purchase price of property being condemned as a criteria of its present worth, the change in the conditions of the property since the time of purchase is the most important consideration. Henderson does not support defendant's position that due to the improved value of the Craigmiles property, the sale price to C. B. K. does not bear on the value of plaintiffs' property.

St. Louis Electric Terminal Railway Co. v. Mac Adaras, 257 Mo. 448, 166 S.W. 307 (1914), cited by defendants, involved the condemnation of property within the City of Saint Louis. Evidence of the value of property one block from that then being condemned was excluded as being "entirely too dissimilar under the record." The factual reasoning for the ruling in that case is not stated. It is not persuasive in view of the later cases cited herein.

■ The discretion of the trial judge controls the admissability of the sale price of comparable land in establishing the value of the land in question. No abuse of such discretion is shown.

The second claim of error arises out of the cross examination of one of defendant's witnesses in which plaintiffs' counsel undertook to prove salaries and wages paid to the officers and employees of the defendants. Also, the facts that the defendant was a Delaware Corporation, that its president had his office in the Traders National Bank Building, that airplanes were used to fly corporate officers and employees about on the business of the corporation and the defendant's purported wealth.

■ The defendant itself injected the issue of the defendant's wealth and success as a farming operator by attempting to place before the jury the fact that the defendant lost its land, that the corporate farming venture was not a success. Finally, in the examination of the defendant's manager, he was asked a question directed as to when C. B. K. lost their interest in that land and the objection being sustained, the witness, in response to the next question, as to when they stopped farming, answered unresponsively that their machinery had been repossessed, that it was in receivership and that the Commerce Trust had to advance money to pay the help and that the witness had worked for three months without pay. Plaintiffs' counsel immediately after this unresponsive answer was invited to inquire of the witness on cross examination. Understandably, he sought to remove the sting from the witness' unsolicited comment about the poverty of the defendant at the close of its farming operation by eliciting from the witness' statements of the salaries paid to its officers and employees and the acquisition of its airplanes and other matters which tended to show either that the witness' statement was untrue or that the poverty resulted from mismanagement. Having opened the door, defendant's counsel may not now complain of the vigorous manner in which plaintiffs' counsel pursued the advantage

offered by the defendant's action. Vanne-man v. W. T. Grant Company, 351 S.W.2d 729 (Mo.1961); Land Clearance Authority v. Doerenhoefer, 404 S.W.2d 385 (Mo. Banc 1966).

■ The final claim by the defendant with respect to error in the admission of evidence relates to photographs admitted by the trial court at flood times and at other stages of the river's flow, both of the plaintiffs' property and of the defendant's structure. It is not entirely clear that this point is even raised by defendant's motion for a new trial, but it is apparent that the photographic evidence referred to was not offered for the purpose of proving damages, but to show the effect of the structure upon the stream on the issue of negligence. An examination of the photographic exhibits does not demonstrate that they would have the effect of showing specific damage to plaintiffs' land. No authority is cited by the defendant on this point, and it is overruled.

■ Defendant claims in Point 7 of his brief that: "The verdict is so excessive as to show bias, passion, and prejudice on the part of the jury and should therefore be set aside." In the argument set out below Point 7, the only substantive assertion defendant makes is that the jury awarded its verdict without proof of a "causal connection" between the defendant's actions and the damages plaintiffs claim, which, defendant claims, indicates enough bias and prejudice on the part of the jury to require a new trial. All issues pertaining to proximate cause, causal connection, and the extent of defendant's liability therefor have been answered above. Therefore, defendant's remaining claim is the naked assertion that the extent of the verdict indicates passion and prejudice on the part of the jury.

"It is not the function of an appellate court to pass on the weight of the evidence in a jury case and that is the reason an ap-pellate court will not make a determination of bias and prejudice of the jury on amount of the verdict alone." Dougherty v. Smith, 480 S.W.2d 519 (Mo.App.1972). Presuming the sound discretion of the trial judge who was present at the trial and who then denied defendant's motion for a new trial on these grounds of jury prejudice, an appellate court is simply not in a position to second guess the trial court's judgment by basing its decision for a new trial solely on the amount of the verdict. "The amount of the verdict, standing alone, does not necessarily indicate bias and prejudice of the jury . . . Something more in the record than the size of the verdict must appear, and defendants point to nothing that happened in the trial which would have engendered bias and prejudice and would have constituted misbehavior on the jury's part." Warriner v. Eblovi, 485 S.W.2d 700 (Mo.App.1972).

Defendant cites Grodsky v. Consolidated Bag Co., 324 Mo. 1067, 26 S.W.2d 618, 624 (Mo.1930), and Ulrich v. Kiefer, 90 S.W. 2d 140, 144 (Mo.App.1936). Both these cases stand for an exception to the above-stated rule denying appellate review on the bare assertion that the verdict amount indicates bias or prejudice by the jury. A new trial is granted in those cases, because on a perusal of the whole record, the appellate court found the verdicts in each of those personal injury cases either "shockingly inadequate" or such as to "shock the understanding." In each case, the verdict merely compensated plaintiff for his initial medical expenses. Because loss of earnings and pain and suffering were obviously not included, a new trial was granted. The $28,750 verdict here does not "shock the understanding" when the damage estimates in the record ranged from no damage to $88,685.00. Although Gardner v. Stout, 342 Mo. 1206, 119 S.W.2d 790, 792 (1938), cited by defendant, does support defendant's position that the amount of the verdict alone indicates bias or prejudice by the jury, in that case, the record also showed "agitation and sentiment" ex-

pressed during the trial. Defendant has not pointed out, nor have we found, any such evidence in the case at hand.

█ If the only reasonable hypothesis to explain a verdict is that it results from prejudice or willful disregard of instructions, that verdict must be extremely excessive or not supported by the evidence. Wolfe v. Harms, 413 S.W.2d 204 (Mo. 1967).

The amount of damages testified to by expert witnesses at the trial varied. Defendant's expert estimated that plaintiffs suffered essentially no damage. Plaintiffs' expert witness assessed plaintiffs' damages at $88,685.00. The $28,750 verdict is well within the range of expert evidence produced at trial. State ex rel. State Highway Commission v. Twin Lakes Golf Club, Inc., 470 S.W.2d 313 (Mo.1971) held a $35,000 verdict not excessive and supported by evidence which included expert witness damage estimates ranging from $34,500 to $56,000. A verdict of $25,000 was upheld in State ex rel. State Highway v. Dockery, 340 S.W.2d 689 (Mo.1961) where the damage estimates at trial ranged from $19,400 by condemnor's experts to defendant's evidence of greater value; such estimates "constituted substantial evidence." When condemnee's expert witnesses' estimates ranged from $25,250 to $40,000 and condemnor's estimates were of $20,000 damage, a $20,000 award to condemnees was held not excessive in State ex rel. State Highway Commission v. Casey, 490 S.W.2d 373 (Mo.App.1973).

Defendant's claim under this point does not fall under either exception to the rule that an appellate court will not overturn a verdict on grounds of prejudice or bias due solely to the amount of the verdict. The verdict is supported by the evidence. Defendant has not shown anything which happened during the trial that would engender passion or prejudice by the jury. Defendant's assertion under Point 7 of its brief is denied.

Finding no error, the judgment of the court entered upon the jury verdict is affirmed.

All concur.